**MONONGAHELA POWER COMPANY,**
**Petitioner,**

v.

**ENVIRONMENTAL PROTECTION**
**AGENCY, Respondent.**

No. 76–2045.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 14, 1977.

Decided Nov. 8, 1978.

Lawrence A. Demase, Pittsburgh, Pa. (Harold R. Schmidt, Frederick W. Steinberg and Ronald S. Cusano, Rose, Schmidt, Dixon, Hasley & Whyte, Pittsburgh, Pa., on brief), for petitioner.

Thomas A. Pursley, III, Atty., Dept. of Justice, Washington, D. C. (Peter R. Taft, Asst. Atty. Gen., G. William Frick, Gen. Counsel, Lee A. Dehihns, III, Atty., E. P. A., Washington, D. C., on brief), for respondent.

Before FIELD, Senior Circuit Judge, and WIDENER and HALL, Circuit Judges.

WIDENER, Circuit Judge:

Monongahela Power Company has petitioned this court to set aside the May 28, 1976 order of the Environmental Protection Agency (EPA) denying an adjudicatory hearing under 40 C.F.R. §§ 125.36(b), 423.-10, et seq, with respect to the July 1, 1977 best practicable technology (BPT)[1] compliance deadlines in the National Pollutant Discharge Elimination System (NPDES) permit[2] issued for its Albright, West Virginia steam electric power station.

Monongahela argues that Congress intended industries subject to NPDES permits to have adequate lead time to construct treatment facilities; that EPA's delay in issuing the permit prevented compliance with the July 1, 1977 deadline; and that the EPA accordingly should have granted a hearing in which Monongahela could present its arguments for an extension. The EPA's basic argument is that under the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1251, et seq., it lacks the authority to extend the Congressionally mandated July 1, 1977 deadline contained in the permit,[3] and, if that be true, since the deadline could not have been extended, there was no justification for granting a hearing.

Various courts of appeals have considered whether under the FWPCA the EPA was permitted to approve an extension of the July 1, 1977 BPT deadline. The Sixth Circuit, in *Republic Steel Corp. v. Train,* 557 F.2d 91 (6th Cir. 1977) vacated, without formal opinion, "for further consideration in the light of [Public Law 95–217]," 434 U.S. 1030, 98 S.Ct. 761, 54 L.Ed.2d 778 (1978), held that the July 1 date was not inflexible; the Third and Seventh Circuits, *Bethlehem Steel Corp. v. Train,* 544 F.2d 657 (3d Cir. 1976), cert. den., 430 U.S. 975, 97 S.Ct. 1666, 52 L.Ed.2d 369 (1977); *United States Steel Corp. v. Train,* 556 F.2d 822 (7th Cir. 1977), have found the July 1 deadline to be mandatory. Compare also our opinion in *State Water Control Board v. Train,* 559 F.2d 921 (4th Cir. 1977), in a different context. Provisions in the Clean Water Act of 1977, P.L. 95–217, 91 Stat. 1566, et seq, enacted after oral argument in this case, make it unnecessary for us to decide whether the EPA was empowered to grant the requested extension. The addition in the 1977 amendments of § 309(a)(5)(B) to the FWPCA grants to the Administrator of the EPA the power to extend the July 1, 1977 deadline to a date which will achieve compliance at the earliest time possible, but not later than April 1, 1979.[4]

1. Sections 304(b) & (b)(1)(A) of the Federal Water Pollution Control Act, 33 U.S.C. § 1314(b) & (b)(1)(A), require the Administrator of the EPA to publish regulations "providing guidelines for effluent limitations" that "[identify] the degree of effluent reduction attainable through the application of the best practicable control technology currently available . . . ."

2. Section 402 of the Federal Water Pollution Control Act, 33 U.S.C. § 1342, establishes the National Pollutant Discharge Elimination System, under which a permit may issue for the discharge of pollutants if the discharge will meet specified requirements.

3. Section 301(b)(1)(A) of the FWPCA, 33 U.S.C. § 1311(b)(1)(A), requires effluent limitations which require the application of BPT not later than July 1, 1977, and under Section 402(a)(1), 33 U.S.C. § 1342(a)(1), a NPDES permit must meet, inter alia, all applicable requirements of Section 301 or meet certain other discretionary requirements of EPA.

4. Section 309(a)(5)(B) of the FWPCA reads in full as follows:

"The Administrator may, if he determines (i) that any person who is a violator of, or any person who is otherwise not in compliance with, the time requirements under this Act or in any permit issued under this Act, has acted in good faith, and has made a commitment (in the form of contracts or other securities) of necessary resources to achieve compliance by the earliest possible date after July 1, 1977, but not later than April 1, 1979; (ii) that any extension under this provision will not result in the imposition of any additional controls on any other point or nonpoint source; (iii) that an application for a permit under section [402] of this Act was filed for such person prior to December 31, 1974; and (iv) that the facilities necessary for compliance with such requirements are under construction, grant an extension of the date referred to in section [301](b)(1)(A) to a date which will achieve compliance at the earliest time possible but not later than April 1, 1979."

■ We have had the benefit of post-argument briefs from both the EPA and Monongahela on the effect of the 1977 amendment on this litigation. EPA argues that the 1977 Act vindicates its earlier position of an inflexible BPT deadline, and that the question of whether new § 309(a)(5)(B) allows relief for Monongahela is not now before the court. However, in view of the 1977 Act, EPA's argument that it lacks the power to grant the requested extension is obviously without merit. Regardless of whether the EPA formerly was empowered to grant the extension, it now does have the power and on remand Monongahela consequently will be afforded an opportunity to present its justification for an extension.[5]

We presently express no opinion on the question of whether Monongahela ultimately should be granted the § 309(a)(5)(B) extension. But, because the record and statements of EPA indicate at least in part an incorrect view of the standards to be followed on remand under § 309(a)(5)(B), we feel it necessary to discuss the question and to give instructions to be followed with respect to the "good faith" requirement.

Before the July 1, 1977 BPT deadline, the EPA provided a practical avenue of relief for certain industrial dischargers who, for reasons beyond their control, would be unable to meet the deadline. On June 3, 1976, in a memorandum to Regional Administrators, Regional Enforcement Directors, and NPDES State Directors, the EPA outlined a policy of issuing Enforcement Compliance Schedule Letters (ECSL).[6] The ECSL procedure was denominated as an exercise of Agency prosecutorial discretion, for, although dischargers still would be required to meet the July 1 deadline in their NPDES permit, an ECSL contained the commitment that, for those qualifying, the EPA would not seek enforcement action before a date set in the ECSL by which full compliance would be required. To qualify for an ECSL, dischargers were required to provide: (1) documented evidence that, despite all reasonable good faith efforts, it cannot achieve BPT by July 1, 1977; and (2) a critical path or other construction management analysis of the shortest reasonable schedule by which it can achieve BPT. Further, the ECSL was to be issued only where NPDES permits were not timely issued, where delays occurred in the resolution of adjudicatory hearings, or where thermal discharge determinations under § 316(a) of the FWPCA, 33 U.S.C. § 1326(a), had resulted in delay. When a discharger's projected failure to achieve BPT was occasioned in whole or in part by a lack of good faith, the ECSL was not to be issued.

Monongahela applied for an ECSL, which the EPA denied without explanation. The EPA's brief in this court, however, revealed that no ECSL was issued "because Monongahela's inability to meet the statutory compliance deadline was not totally founded on good faith." No other reason was given and none was suggested. When asked to explain the basis for the determination of Monongahela's lack of good faith, EPA replied that the effluent limitations contained in the Albright NPDES permit were essentially identical to limitations originally proposed in March 1974, and made final on October 8, 1974, 39 F.R. 36198, 40 C.F.R. part 423. In the EPA's view, Monongahela thus was made aware of the effluent standards that eventually were incorporated into the Albright permit more than two years before the BPT deadline, and any compliance difficulties accordingly must be attributed to Monongahela. Monongahela's participation in *Appalachian Power Co. v. Train*, 545 F.2d 1351 (4th Cir. 1976), the EPA argues, does not affect

---

5. The Agency recently has established procedures for applying for a § 309(a)(5)(B) extension. *Final EPA Policy On Extending BPT Deadline For Industrial Dischargers*, reprinted in 8 *Envir.Rep.* 1967–75. On remand the Agency may treat Monongahela's request for a hearing as such an application, or in the exercise of its discretion establish some other procedure,

provided that Monongahela is afforded a full and fair opportunity to present its case.

6. EPA memoranda on the standards and procedures for the issuance of Enforcement Compliance Schedule Letters to industrial dischargers are reprinted in 7 *Envir.Rep.* 241–42, 244–46 (1976).

ECSL determination of lack of good faith in any way favorable to Monongahela because the regulations there reviewed which were held invalid involved heat discharge provisions, not the BPT limitations contained in the Albright permit.

In its supplementary brief, the EPA states its belief that new § 309(a)(5)(B) codifies and replaces its former ECSL policy. Since the filing of the briefs, the Agency has developed its *Final EPA Policy On Extending BPT Deadline For Industrial Dischargers,* 8 *Envir.Rep.* (BNA) 1967–75 (1978) (hereafter Final Policy). The *Final Policy* appears to modify in part the views of the EPA as expressed in its supplemental brief, but not with respect to the determination of good faith as required under § 309(a)(5)(B). See *Final Policy* at 1969:

"Since section 309(a)(5)(B) to a large extent is based on the ECSL policy, good faith criteria that Regional Offices used in evaluating ECSL requests are also applicable. Where a discharger would not have qualified for an ECSL for lack of good faith, it would not qualify for relief under section 309(a)(5)(B)."

Given this background and the reasons expressed for EPA's previous finding that Monongahela lacked good faith, there is every likelihood that deadline extension proceedings on remand would simply result in a pro forma reapplication of the Agency's record views, with the consequent denial to Monongahela of even the possibility of compliance relief. We are of opinion, however, that as expressed by its action on the Albright ECSL application, the EPA's rationale for determining lack of good faith is erroneous under the provisions and legislative history of new § 309(a)(5)(B) that will govern the proceedings on remand.[7]

■ The legislative history of the 1977 Act gives to the requirement of "good faith" a definition that was not necessarily reflected under the former ECSL criteria: "a reasonable attempt to comply with the mandates of law." *S.Rep.* 95–370 at 61;

1977 *U.S.Code Cong. & Admin.News,* at 4326, 4386. Contrary to the position of the EPA in this litigation, the legislative history demonstrates that the non-frivolous pursuit of judicial remedies provided by law, far from being evidence of bad faith may be evidence of "a reasonable attempt." With respect to almost the precise situation before us, the following question and answer are on point. Congressman McCormack was concerned with the effect of litigation on the "good faith" requirement. He asked Congressman Roberts, a House manager and chairman of the Water Resources Subcommittee of the Committee on Public Works and Transportation:

"Would an industrial discharger, which subsequent to the issuance of its permit, brought proceedings to modify the permit, or seek a variance, or which participated in other litigation appealing the EPA's effluent limitations and which delayed construction of treatment facilities pending the outcome of such proceedings or litigation, be deemed by reason thereof not to have acted in good faith?

"MR. ROBERTS. If the gentleman will yield, Mr. Speaker, the answer is 'No. Good faith should be judged by the reasonableness of the legal position, the uncertainties of the statutory interpretations, the lack of dilatory intent, and other factors.' "

Congressman Clausen, another of the House managers, concurred in Congressman Roberts' response. 123 Cong.Rec. at H12959. See also the statement of the House manager, Congressman Anderson, at H12957.

Viewed in light of this history, the reasons advanced by EPA for denying the ECSL on the basis of a perceived lack of good faith are without merit.

EPA's position that "the BPT effluent limitations which were inserted into Monongahela's permit were *not* challenged . . ." (emphasis is EPA's), is simply incorrect. Equally incorrect is EPA's treatment of Monongahela's contention in the *Appalachi-*

---

7. We express no opinion on whether Monongahela has complied with the other requirements established by § 309(a)(5)(B).

**322**

an *Power* case as merely a point initially decided in *E. I. duPont DeNemours and Co., et al. v. Train*, 541 F.2d 1018 (4th Cir. 1976). *Appalachian Power* was one of a series of cases which included *duPont*. Both of these cases, and others, were before the same panel of this court at the same time. Both the power companies and the chemical companies challenged the authority of EPA to issue any regulations, including the BPT regulations at issue here. The challenge was far from frivolous. In *duPont* we said of the matter: "This issue goes to the heart of the controversy," p. 1026, and devoted a substantial part of the opinion to the question. Of the three circuits which had decided the matter at the time of our decision in *duPont*, one had held, consistent with the contention of the power companies, that "the Administrator may not promulgate regulations establishing effluent limitations for existing sources," *duPont* p. 1026, construing *CPC International, Inc. v. Train*, 515 F.2d 1032 (8th Cir. 1975). Two other circuits had held that the Administrator had such authority. *American Iron and Steel Institute v. Environmental Protection Agency*, 526 F.2d 1027 (3d Cir. 1975), and *American Meat Institute v. Environmental Protection Agency*, 526 F.2d 442 (7th Cir. 1975). We stated in our opinion that "The conflict among the circuits emphasizes the confusion caused by this poorly drafted and astonishingly imprecise statute.", *duPont*, p. 1026. It is at once apparent without further explanation that the challenge of the power companies to the validity of all of the regulations was anything but frivolous, and the litigation may not be considered as maintained for the purpose of delay. Monongahela's participation in that litigation, therefore, may not be considered as any evidence of lack of good faith.

On remand, EPA is directed not to consider the participation of Monongahela in either this case or the *Appalachian Power* case as any evidence of bad faith.

We note that *Republic Steel Corporation v. Costle et al.* (on remand) 581 F.2d 1228 (6th Cir. 1978) (the same case as *Republic Steel Corporation v. Train* mentioned

above) is in accord with this opinion as to the authority of EPA to grant extensions.

REMANDED WITH INSTRUCTIONS.