UNITED STATES of America,
Appellant,

v.

HOMESTAKE MINING COMPANY,
Appellee.

No. 78–1728.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 14, 1979.

Decided March 30, 1979.

**422**

Nancy B. Firestone, Atty., App. Section, Land & Natural Resources Div., Dept. of Justice, Washington, D. C. (argued), James W. Moorman, Asst. Atty. Gen., Washington, D. C., David V. Vrooman, U. S. Atty., Sioux Falls, S. D., Shelley M. Stump, Asst. U. S. Atty., Rapid City, S. D., Dirk D. Snel, Washington, D. C., on brief, for appellant.

A. P. Fuller of Amundson & Fuller, Lead, S. D., argued and on brief, for appellee.

Before GIBSON, Chief Judge, HENLEY, Circuit Judge, and HANSON,* Senior District Judge.

HANSON, Senior District Judge.

The United States appeals from an order of the district court granting appellee Homestake Mining Company's motion for relief from a consent decree and stipulation pursuant to Rules 60(b)(5), (6), F.R.Civ.P. The consent decree and stipulation were in settlement of an action brought by the United States to enforce the 1972 Amendments to the Federal Water Pollution Control Act (FWPCA) (now referred to as the Clean Water Act) as they pertained to Homestake's Lead, South Dakota gold mining and milling operation. The decree provided a timetable for meeting specific effluent limitations and stipulated escalating civil penalties in the event of failure to timely attain the specified limitations.

The district court found that "extraordinary circumstances and change in conditions . . . make continued enforcement inequitable" and granted relief from the consent decree. The court's enumerated conclusions and reasoning indicate that it based the ruling on its interpretation of the applicability to Homestake of Section 309(a)(5)(B) of the Clean Water Act, as amended by Section 56(c) of the Clean Water Act of 1977 (hereinafter "the 1977 Act"), 33 U.S.C.A. § 1319(a)(5)(B),[1] and its determination that Homestake satisfied the requirements for a time extension available to certain dischargers under the 1977 Act. Because we conclude that the district court's view of the statute was erroneous and that the district court was without authority to determine whether Homestake satisfied the requirements of the extension provision, we vacate the district court's order.

I.

As noted, Homestake owns and operates a gold mine and milling operation in Lead, South Dakota. It discharges waste water containing tailings, heavy metals, and suspended solids into Gold Run Creek, a tributary of Whitewood Creek.

On September 3, 1976 the Environmental Protection Agency (EPA) issued a final National Pollutant Discharge Elimination System (NPDES) permit to Homestake which permitted it to continue discharging under specified conditions. The permit was subject to the time limitations and requirements of Section 301 of the Clean Water Act, specifically 33 U.S.C. §§ 1311(b)(1)(A)

* The Honorable William C. Hanson, Senior District Judge, Southern District of Iowa, sitting by designation.

1. Pub.L. No. 95–217, 91 Stat. 1566, 1593 (1977).

and (C). The pertinent statutory language provides:

> (b) In order to carry out the objective of this chapter there shall be achieved—
>
> > (1)(A) not later than July 1, 1977, effluent limitations for point sources . . . which shall require the application of the best practicable control technology currently available . .
> >
> > . . . . .
> >
> > (C) not later than July 1, 1977, any more stringent limitation, including those necessary to meet water quality standards . . . established pursuant to any State law or regulations . . . or any other Federal law or regulation, or required to implement any applicable water quality standards
> >
> > . . . .

Subsection (b)(1)(A) relates to achievement of effluent limitations through the use of the best practicable control technology (BPT), while subsection (b)(1)(C) concerns, *inter alia*, achievement of more stringent limitations necessary to meet state water quality standards. South Dakota has established more stringent water quality standards for Whitewood Creek, which the state has designated as a cold water marginal fishery. *See* 33 U.S.C. § 1370.

Homestake did not meet the July 1, 1977 deadlines. In lieu of immediately seeking civil penalties, EPA enforcement officials entered into negotiations with Homestake with a view toward establishing a timetable for compliance to be embodied in a consent decree. When finalized the decree provided that until December 4, 1977 Homestake could discharge waste water into Gold Run Creek under pre-July 1, 1977 conditions stated in the NPDES permit. Effective December 4, 1977 Homestake's waste water discharge was to contain substantially no tailings, and effective April 2, 1978 Homestake was required to meet all effluent conditions set in the permit. To meet the December deadline it was necessary for Homestake to complete a tailings pond.

Homestake was required to install a final waste water treatment system in order to satisfy the April 1978 deadline. Stipulated civil penalties of up to $10,000 per day were provided in the event of noncompliance. For its part, EPA agreed not to seek statutory penalties for Homestake's violations of Section 301 for the period subsequent to July 1, 1977 until the date of entry of the decree.

The decree contemplated modification of its provisions "where circumstances, statutory or regulatory amendments, and the interest of justice so warrant." By its terms, the decree was to "terminate" on July 1, 1978.

The decree was agreed to by the parties early in October 1977 and together with the complaint was initially filed with the district court on January 17, 1978. Following mandatory publication in the Federal Register and a thirty-day public comment period, 28 C.F.R. § 50.7, the consent decree was signed by the court on March 10, 1978. One week later, March 17, 1978, Homestake filed its Rule 60(b) motion together with a motion for a stay of proceedings to enforce the consent decree under Rule 62(b), F.R.Civ.P. The district court order sustaining the Rule 60(b) motion was entered on August 3, 1978.

On December 27, 1977 the Clean Water Act of 1977 was enacted.[2] The Act amended Section 309 in part by adding subsections (a)(5) and (a)(6). As codified, Section 309(a)(5)(B) provides:

> (B) The Administrator may, if he determines (i) that any person who is a violator of, or any person who is otherwise not in compliance with, the time requirements under this chapter or in any [NPDES] permit issued under this chapter, has acted in good faith, and has made a commitment (in the form of contracts or other securities) of necessary resources to achieve compliance by the earliest possible date after July 1, 1977, but not later than April 1, 1979; (ii) that any extension under this provision will not result in the imposition of any additional controls on

---

**2.** *See* note 1 *supra*.

any other point or nonpoint source; (iii) that an application for a permit under section 1342 of this title was filed for such person prior to December 31, 1974; and (iv) that the facilities necessary for compliance with such requirements are under construction, grant an extension of the date referred to in section 1311(b)(1)(A) [Section 301(b)(1)(A)] of this title to a date which will achieve compliance at the earliest time possible but not later than April 1, 1979.

33 U.S.C.A. § 1319(a)(5)(B). By its terms Section 309(a)(5)(B) authorizes an extension of the July 1, 1977 deadline to April 1, 1979 for good faith dischargers under defined circumstances.

Homestake's Rule 60(b) motion was predicated on the enactment of Section 309(a)(5)(B). In an accompanying memorandum filed in the district court, Homestake argued that the 1977 Act constituted a subsequent statutory change and noted that the company had submitted a request for a Section 309(a)(5)(B) extension to the EPA by a letter dated February 7, 1978. This request was denied in a letter from the EPA's Regional Administrator at or about the same time Homestake filed its motion. In line with agency policy on the applicability of the 1977 Act, the letter stated:

> [W]ith respect to Homestake's request for a 309(a)(5)(B) extension, EPA cannot grant such an extension for Homestake since that provision of the Clean Water Act is specifically applicable only to extensions for compliance with "BPT" limitations, not limitations based on water quality standards.

The letter evinces no consideration of the four qualifying criteria set forth in the statute.

The relevance of the distinction between BPT limitations and water quality standards in the context of this case merits some explanation. Homestake's NPDES

permit reflects limitations mandating elimination of the direct discharge of mill tailings and waste water treatment. The permit contains both BPT-based limitations and limitations necessary to meet state water quality-based standards. As we understand the record, Homestake has in fact been utilizing a tailings pond since December 4, 1977 in compliance with the consent decree, and this is the aspect of the decree primarily governed by BPT limitations. Thus Homestake's vulnerability to sanctions under the consent decree presently extends to a failure to meet the April 2, 1978 waste water treatment requirements. For the most part these were directed at meeting the more stringent limitations necessary to attain state water quality-based standards applicable by virtue of Homestake's discharge into a tributary of Whitewood Creek.[3] Because water quality-based standards predominate in Homestake's permit, any extension available to Homestake would work an extension of the Section 301(b)(1)(C) time period for more stringent limitations based on water quality standards.[4]

Homestake argued that EPA had erroneously interpreted Section 309(a)(5)(B) to limit the availability of an extension to BPT-based permits only. As Homestake viewed it, the statutory language was ambiguous in its reference to granting extensions "of the date referred to in section 1311(b)(1)(A)" which pertains to BPT effluent limitations. Homestake maintained that the provision was better suited to its purpose if the quoted language were read as simply stating a date, i. e., July 1, 1977. If Section 309(a)(5)(B) was applicable, Homestake asserted that it satisfied the eligibility criteria delineated therein, laying special stress on the requisite good faith attempt at compliance as the determinative criteria.

---

**3.** State water quality standards govern 10 out of 12 parameters (other than flow limitation) for which specific numeric limitations are included in Homestake's NPDES permit.

**4.** EPA appears to take the position in its brief that where both BPT-based and water quality-based standards appear in the same permit, the permit should be characterized as being based on more stringent state water quality standards.

EPA responded that the enactment of Section 309(a)(5)(B) was not sufficient ground for Rule 60(b) relief for three reasons: first, issuance of a Section 309(a)(5)(B) extension order is a discretionary and nonreviewable enforcement option available to the agency; second, Section 309(a)(5)(B) extended only to NPDES permit limitations based on BPT and not to those based on water quality standards; and lastly, Homestake had not demonstrated good faith.

The district court agreed with Homestake on the availability of Section 309(a)(5)(B) extensions to a permit holder in Homestake's position. Further, the court concluded that Homestake "has made a good faith effort to comply with the requirements of the 1972 Clean Water Act" and qualified for an extension under the 1977 Act.

Though the procedural cast of this case is an unusual one in which to grapple with statutory interpretations, we are convinced that because the district court decided the issue and the EPA based its denial of Homestake's request for an extension on no other ground, we should confront the question of the availability of Section 309(a)(5)(B) extensions to. water quality-based permits. Before doing so, however, a threshold mootness issue is presented by the government.

## II.

### A.

Though a stipulated civil penalty is provided for in the consent decree, the EPA has not yet attempted to enforce the penalty in the district court, though the government does have a separate action pending against Homestake seeking an injunction and penalties for violations of the Clean Water Act after July 1, 1978.[5] There appears to be no dispute that penalties are owed under the decree. Further, we infer from the record and statements made by Homestake's counsel at argument that Homestake has not been making penalty payments pursuant to the stipulation. The government maintains that any case or controversy was mooted by the expiration of the decree on July 1, 1978 prior to the entry of the district court's order and cannot be revived absent an attempt to collect the penalties.

 The July 1, 1978 date is not really particularly significant. We do not understand the government to argue that language in the decree stating it "shall terminate July 1, 1978" means subsequent to that date the government may not attempt to collect delinquent stipulated penalties accrued prior to July 1, though the parties could have so agreed. A consent decree is a judicial act and "possesses the same force and character as a judgment rendered following a contested trial." *Siebring v. Hansen,* 346 F.2d 474, 477 (8th Cir.) *cert. denied,* 382 U.S. 943, 86 S.Ct. 400, 15 L.Ed.2d 352 (1965). *See Inmates of Boys' Training School v. Southworth,* 76 F.R.D. 115, 123 (D.R.I.1977). The penalties are therefore subject to enforcement by appropriate process. Rules 54(a), 69, F.R.Civ.P. In the absence of relief, Homestake is obligated to satisfy its liabilities set forth in the decree notwithstanding that the decree governed the rights and responsibilities as between the parties for only a limited period of time.

---

**5.** There has been a considerable amount of litigation involving one or both of the parties: (1) In *Homestake Mining Co. v. United States, EPA,* 584 F.2d 862 (8th Cir. 1978) this Court dismissed as time-barred a petition to review a decision of the Administrator denying a request to modify Homestake's NPDES permit; (2) Homestake has filed complaints in the district court challenging EPA's approval of South Dakota's water quality standards and seeking a declaratory judgment that Section 309(a)(5)(B) does apply to permit limitations based on state water quality standards (the latter has been stayed pending this appeal); and (3) Homestake has challenged in state court the 1977 Water Quality Standards for South Dakota adopted by the South Dakota Board of Environmental Protection. Subsequent to the filing of the notice of appeal in this cause, the South Dakota circuit court upheld the standards with the exception of a regulation relating to levels of toxicants. The EPA advises that Homestake's NPDES permit limitations for zinc and copper may be affected by the state court ruling, a fact that does not materially concern this appeal.

At bottom the government's mootness argument draws together an amalgam of justiciability interests into a form of hybrid ripeness issue. *See generally* 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3532 (1975). The government focuses on the fact that it has not attempted to collect the stipulated penalties. It asserts that the case or controversy was rendered moot by the termination of the decree on July 1, 1978 and cannot be brought back to life now absent an attempt to collect penalties. As noted, we are unpersuaded that the July 1, 1978 date is of seminal importance. Similarly, we do not find the ripeness analogy persuasive.

This is not a case like *Oil Workers Union v. Missouri*, 361 U.S. 363, 80 S.Ct. 391, 4 L.Ed.2d 373 (1960), relied on by the government, in which a party asks a court to rule on the validity of a statute providing penalties before the penalties are assessed, or where the matter is pending before an administrative or judicial tribunal. *Id.* at 371, 80 S.Ct. 391. Speculation as to whether and under what conditions penalties might be assessed or a burden imposed may subject such lawsuits to dismissal as too contingent to be justiciable. *See, e. g., Goodman v. Parwatikar*, 570 F.2d 801, 805–06 (8th Cir. 1978); *Cass County v. United States*, 570 F.2d 737, 740–41 (8th Cir. 1978); *International Tape Manufacturers Assoc. v. Gerstein*, 494 F.2d 25, 27–29 (5th Cir. 1974). *See also Inland Oil & Transport Co. v. Adams*, 575 F.2d 184, 190–91 (8th Cir. 1978). There is nothing contingent here about Homestake's liability for penalties; it has agreed to pay them in a consent decree it now seeks relief from. *See Oil Workers Union v. Missouri*, 361 U.S. at 369 n.13, 80 S.Ct. 391. The facts are definite and concrete, not hypothetical or abstract. The EPA brought an action to enforce the Clean Water Act and secured a judgment against Homestake in the form of a consent decree. Rule 54, F.R.Civ.P. The controversy over relief from that decree centers precisely on the legal relations of the parties, for the district court has granted relief on the basis of the applicability of Section 309(a)(5)(B). Lastly, specific and conclusive relief is available in the form of an order under Rule 60(b). Under the familiar doctrines governing the existence of a case or controversy, the present dispute is a justiciable one. *See, e. g., North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971); *Golden v. Zwickler*, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); *United Public Workers v. Mitchell*, 330 U.S. 75, 89–90, 67 S.Ct. 556, 91 L.Ed. 754 (1947); *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 81 L.Ed. 617 (1937). Nor do we know of any support for the proposition that a dispute becomes nonjusticiable merely because the government might not seek execution as provided for in the consent decree. We are not completely clear about the government's intentions in this regard,[6] but in the absence of a release or facts having a similar conclusive effect, we do not believe that the contingency, if any, of execution bears any real relation to the usual concerns about the interest of the parties and the proper development of facts inherent in the notion of justiciability. *See Cass County v. United States*, 570 F.2d at 740–41.

### B.

A district court's ruling on a Rule 60(b) motion will not be reversed on appeal unless it evidences an abuse of discretion. *See Whitlock v. Midwest Acceptance Corp.*, 575 F.2d 652, 653 n.1 (8th Cir. 1978); *Clarke v. Burkle*, 570 F.2d 824, 830 (8th Cir. 1978). The district court granted relief under

---

**6.** In a supplemental memorandum filed in district court, the government declared:

The United States fully intends to enforce the present Consent Decree in order to maintain the integrity of the Clean Water Act's pollution control program, and therefore requests that the Court deny Homestake's motion for relief and order Homestake to comply with the terms and conditions of the decree.

In argument before this Court, counsel for the government was more tentative about the government's intention to enforce the decree.

Rules 60(b)(5) and (6).[7] Though the court stated in a memorandum accompanying its ruling that it considered "other circumstances" including "mechanical problems, weather problems and strikes by various workers" in connection with the motion, the court's conclusions focused on the 1977 Act as follows:

(1) This Court does have the power to grant the defendant's motion to stay the Consent Decree.

(2) Section 1319(a)(5)(b) which gives the Administrator the power to grant an extension for compliance with the Clean Water Act of 1972 does apply to the defendant's permit.

(3) The defendant, Homestake Mining Company, has made a good faith effort to comply with the requirements of the 1972 Clean Water Act.

Memorandum at 8, 9.

The discussion of the third of these conclusions in the district court's memorandum addressed itself to whether Homestake had a made a good faith effort to comply with the Act in the context of the Section 309(a)(5)(B) good faith requirement for an extension. Thus the district court's conclusions numbered (2) and (3) merge, with the result that if the EPA is correct in its interpretation that Section 309(a)(5)(B) is inapplicable, it follows the district court abused its discretion by grounding its relief on a contrary view of the law. On the other hand, if Homestake were *entitled* to an extension under the 1977 Act which was passed after the consent decree was agreed to, this Court would most likely not disturb the district court's order granting relief. *See System Federation v. Wright,* 364 U.S. 642, 646–53, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961). Consideration of Section 309(a)(5)(B) is therefore dispositive of the appeal.

In concluding that Section 309(a)(5)(B) authorized extensions for BPT and water quality standard based limitations, the district court relied on the use of general language by Congress to describe the good faith criterion for an extension: "*any* person who is a violator of, or *any* person who is otherwise not in compliance with, the time requirements under this chapter or in *any* permit issued under this chapter, [who] has acted in good faith . . . ." (Emphasis added.) 33 U.S.C.A. § 1319(a)(5)(B).[8] However, in the operative language authorizing extensions, the 1977 Act refers only to extensions from BPT permit limitations. Deleting the four qualifying criteria, the statute reads: "The Administrator may . . . grant an extension of the date referred to in Section 1311(b)(1)(A) [Section 301(b)(1)(A)] of this title to a date which will achieve compliance at the earliest time possible but not later than April 1, 1979." As noted, Section 301(b)(1)(A) concerns effluent limitations based on BPT. The district court concluded that the reference to the BPT provision to describe the deadline subject to extension did not limit the availability of extensions to BPT-based permits, but merely was a way of noting the original deadline *date* stated in the statute for both BPT and water quality standard limitations, July 1, 1977. *See* 33 U.S.C. §§ 1311(b)(1)(A), (C). The district court found encouragement for this view in the legislative history. The court also reasoned that it would logically be more difficult to timely comply with more stringent water quality-based limitations than with BPT limitations, and hence to confine extensions only to the latter would not adequately serve the purpose of alleviating the consequences of good faith but unsuccessful attempts at compliance.

■ We disagree with the district court. It is difficult to believe that Congress would enact patently misleading language referencing one important statutory section

---

**7.** Rules 60(b)(5) and (6) permit relief for the following reasons:

(5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

**8.** Homestake's NPDES permit was issued under the chapter referred to.

but not another if Congress intended the subsequent statute to modify both. Further, we are not persuaded that the use of broad language in delineating one of four qualifying criteria governs over operative language applicable to the provision as a whole. The essential language is: "[T]he Administrator may . . . grant an extension of the date referred to in section 1311(b)(1)(A) . . . ," the BPT limitation provision. Had Congress meant to embrace more stringent water quality-based limitations, it could easily have referred to the dates in "section 1311(b)(1)(A) or (C)." It did not and, in addition, another similar extension provision of the Clean Water Act of 1977 lends support to what we would otherwise be bound to presume—that the omission has significance. The Act also amended Section 309 by adding subsection (a)(6). 33 U.S.C.A. § 1319(a)(6). Subsection (a)(6) makes extensions available for permit holders who discharge into publicly-owned treatment works, and specifically makes an extension available when the EPA finds, *inter alia*, "that any person is in violation of section 1311(b)(1)(A) *or (C)* [Section 301(b)(1)(A) or (C)] of this title . . . ." (Emphasis added.) Having specifically referred to water quality-based limitations in the contemporaneously enacted and similar subsection (a)(6), the inference is inescapable that Congress intended to exclude extensions for water quality-based permits under subsection (a)(5) by referring therein only to Section 301(b)(1)(A). *See generally* H.R.Conf.Rep. No. 95–830, 95th Cong., 1st Sess. 88–89, *reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 4463–64.

To the extent there may be ambiguity in the statutory language, the legislative history favors the EPA Administrator's limited view of the 1977 Act. As Homestake points out, there are general references in the relevant floor debates to Section 309(a)(5)(B) as affording relief from timetables for good faith industrial dischargers. *See, e. g.,* 123 Cong.Rec. H12,919, S19,650–51, S19,684 (daily ed. Dec. 15, 1977) (remarks of Rep. Roberts, Sen. Muskie, and Sen. Moynihan). At other times, however,

references to the extension provision were more carefully drawn. Thus Senator Moynihan observed "the committee has proposed a provision which gives EPA the authority to grant extensions of the 1977 technology requirement deadline to those industrial dischargers who have acted in good faith." 123 Cong.Rec. S13,613 (daily ed. Aug. 4, 1977). The "1977 technology requirement" is a shorthand way of referring to BPT-based effluent limitations for point sources governed by Section 301(b)(1)(A). *See EPA v. California ex rel. State Water Resources Control Board*, 426 U.S. 200, 204–05 & n.11, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976). The relevant committee reports, "the most persuasive indicia of congressional intent," *Housing Authority of City of Omaha v. United States Housing Authority*, 468 F.2d 1, 6–7 n.7 (8th Cir. 1972), *cert. denied*, 410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1973), are more to the point and support the Administrator. The House Conference Report commented that the 1977 Act:

Amends section 309 . . . to provide two new enforcement options for violations of the 1977 *best practicable technology for industrial dischargers. . . .* The second option authorizes up to an 18-month extension of the 1977 deadline where the Administrator finds that the discharger acted in good faith . . . . (Emphasis added.)

H.R.Conf.Rep. No. 95–830, *supra, reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 4463–64. *See also* S.Rep. No. 95–370, 95th Cong., 1st Sess. 60, *reprinted in* [1977] U.S.Code Cong. & Admin.News, p. 4385. Finally, the legislative history reflects that Section 309(a)(5)(B) was enacted in part in response to a decision of the Court of Appeals for the Sixth Circuit holding that EPA's failure to timely promulgate BPT regulations precluded EPA from imposing the July 1, 1977 BPT deadline. *See Republic Steel Corp. v. Costle*, 581 F.2d 1228, 1230–32 & n.9 (6th Cir. 1978), *cert. denied*, —— U.S. ——, 99 S.Ct. 1219, 59 L.Ed.2d 457 (1979) (discussing pertinent case and legislative history); 33 U.S.C. § 1314(b).

Our independent review of the statute and its legislative history is reinforced by the fact that our conclusions are shared by the Administrator. The EPA has promulgated a formal policy statement on Section 309(a)(5)(B) adopting the position that extensions "are available only for failure to meet BPT by July 1, 1977 . . . . . Section 309(a)(5)(B) does not authorize extensions regarding water quality-based effluent limitations, or more stringent State or Federal requirements, under section 301(b)(1)(C)." *Final EPA Policy On Extending BPT Deadline For Industrial Dischargers*, 8 Evir.Rep. (BNA) 1967–75, at 1970 (1978). Since it is charged with administration of the Clean Water Act, the EPA's judgment as to the intendment of enforcement tools provided to it is entitled to deference. *See E. I. duPont deNemours & Co. v. Train*, 430 U.S. 112, 134–35 & n.25, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977); *Train v. Natural Resources Defense Council, Inc.*, 421 U.S. 60, 87, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Hodgson v. Security National Bank of Sioux City*, 460 F.2d 57, 59 (8th Cir. 1972). Deference is particularly appropriate in light of the fact that Section 309(a)(5)(B) is similar to EPA's earlier informal "Enforcement Compliance Schedule Letter" (ECSL) program (water quality-based limitations were embraced in some ECSL's) and was designed to replace it. *See Monongahela Power Co. v. EPA*, 586 F.2d 318 at 320–21 (4th Cir. 1978). Since Congress followed EPA's lead, we must assume the EPA is in a particularly good position to know to what kinds of effluent limitations Section 309(a)(5)(B) was intended to apply.

Homestake assails EPA's construction of the statute. It argues:

> Under the government's interpretation of Section 309(a)(5)(B), the only class of dischargers who get no relief are those required to meet state water quality based effluent limitations. Such an interpretation is . . . illogical when it is realized that water quality based effluent limitations require the most expensive and most stringent application of technology.

Brief for Appellee at 24. In the context of the vigorous federalism underlying the Clean Water Act, there is no illogic in excepting extensions for NPDES limitations based on more stringent state water quality standards. To do so is consistent with the announced "policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of the States to prevent, reduce, and eliminate pollution . . . . ." 33 U.S.C. § 1251(b). *See* 33 U.S.C. § 1370; *U. S. Steel Corp. v. Train*, 556 F.2d 822, 830 (7th Cir. 1977). Out of concern for the established policy of non-preemption and the states' probable reliance on it in shaping their various water pollution policies, Congress may well have been reluctant to make extensions available for federally granted permit limitations intended to enforce state water quality standards. *Cf. EPA v. California ex rel. State Water Resources Control Board*, 426 U.S. at 218–20, 96 S.Ct. 2022 (1976). Moreover, presumably more stringent water quality-based limitations serve particularized needs where BPT-based effluent limitations might not suffice. In view of the peculiar federal and state interests implicated by any extension of the deadline to achieve more stringent Section 301(b)(1)(C) limitations, insistence on a clear and explicit grant of authority of a kind absent here is warranted. *Compare* 33 U.S.C.A. § 1319 (a)(5)(B) *with* 33 U.S.C.A. § 1319(a)(6).

We think the Administrator's interpretation of the scope of his authority under Section 309(a)(5)(B) is well grounded in the statute and its legislative history, and reasonable in the circumstances. Accordingly, we hold Section 309(a)(5)(B) is not applicable to Homestake's permit.

### C.

Even if we agreed with the district court on the applicability of Section 309(a)(5)(B) to Homestake's permit, we would vacate and remand. It was precipitous for the district court to proceed to

determine, without remanding the matter to the EPA, "whether, if Homestake does qualify under Section 1319(a)(5)(b) [sic], has it met all the requirements or criteria enumerated in that section?" Memorandum at 7. *See NLRB v. Pipefitters*, 429 U.S. 507, 522 n.9, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977); *Monongahela Power Co. v. EPA*, 586 F.2d 318, 320–22 (4th Cir. 1978) (remanding a Section 309(a)(5)(B) extension question to the agency.) By preempting the function of making findings vested in the Administrator by Section 309(a)(5)(B), the district court invaded the agency's primary jurisdiction. *See United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 63–65, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956).

The language of the statute[9] and the legislative history unambiguously demonstrate that whether and to what extent to grant an extension is discretionary with the Administrator, subject to the four enumerated qualifying criteria. The Senate report on the 1977 Act summarized the Administrator's authority:

> This authorization of limited flexibility granted to the Administrator will maintain the pressure for compliance while at the same time enabling the Administrator to use his discretion to grant any justifiable extension.

S.Rep. No. 95–370, *supra, reprinted in* [1977] U.S.Code Cong. & Admin.News, p. 4387. *See* 123 Cong.Rec. S19,651 (daily ed. Dec. 15, 1977) (remarks of Sen. Muskie). Moreover, two Courts of Appeal explicitly or implicitly have recognized that the authorization under Section 309(a)(5)(B) to grant extensions beyond the 1977 deadline is a discretionary enforcement mechanism available to the Administrator in pursuit of compliance with the Clean Water Act. *Monongahela Power Co. v. EPA*, 586 F.2d at 320–23; *Republic Steel Corp. v. Costle*, 581 F.2d at 1232, 1234 & n.17. Operating under its interpretation of the statute, EPA never exercised its discretion under what the district court determined to be the law.[10] If the matter had been remanded to the agency and the agency subsequently declined to grant an extension, in all likelihood the enactment of Section 309(a)(5)(B) would have then been completely inapposite to the Rule 60(b) motion. In any event, the district court had no authority to substitute its judgment for that of the agency, particularly in an area where the requisite qualification findings, inherently technical as they relate to good faith in this context, have appropriately and explicitly been delegated by Congress to the expertise of the EPA. *See Nader v. Allegheny Airlines*, 426 U.S. 290, 303–04, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976); *see also NLRB v. Pipefitters*, 429 U.S. at 531–32, 97 S.Ct. 891; *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 305–06, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973).[11]

### III.

Because it appears that Homestake's Rule 60(b) motion was predicated and resolved in the district court on the basis of an erroneous view of the applicability of Section 309(a)(5)(B) coupled with an intrusion into the EPA's discretion under the statute, we vacate the order appealed from. We recognize that other circumstances not separately raised below or on appeal might conceivably warrant Rule 60(b) relief. We recognize also that the consent decree permits modification "where circumstances, statutory or regulatory amendments, and the interest of justice so warrant." Apart from the con-

---

**9.** Section 309(a)(5)(B) states in permissive terms: "The Administrator *may* . . . grant an extension."

**10.** Homestake argues that since the only reason given in the EPA letter denying an extension was the inapplicability of the statute, the EPA must have exercised its discretion and determined that Homestake satisfied the four statutory criteria. Our view of the record indicates Homestake's assumption here is without merit.

**11.** Because we uphold the EPA's view of the statute, we need go no further and determine under what circumstances, if any, an EPA extension decision is subject to judicial review as an "enforcement option". *Cf. Union Electric Co. v. EPA*, 593 F.2d 299, 304–305 (8th Cir. 1979); *Lloyd A. Fry Roofing Co. v. United States EPA*, 554 F.2d 885, 891–92 (8th Cir. 1977).

text of Section 309(a)(5)(B), unsuccessful good faith attempts at compliance with the decree might amount to reason to modify the decree under its own terms, or a defense to its enforcement. We will not speculate, except to note that nothing in this opinion prohibits Homestake from subsequently filing an appropriate motion in district court or resisting enforcement of the decree on grounds other than Section 309(a)(5)(B) of the Clean Water Act of 1977.

Order vacated and remanded with directions to overrule the motion.