Nunam KITLUTSISTI, an Alaskan nonprofit corporation; Yukon-Kuskokwim Coastal Resource Service Area Board; Trustees for Alaska, an Alaskan nonprofit corporation, Plaintiffs,

v.

ARCO ALASKA, INC., a Delaware corporation; Arco Exploration Company, a Delaware corporation; Atlantic Richfield Company, a Pennsylvania corporation; Ernesta Barnes, Regional Administrator of the Environmental Protection Agency; and William Ruckelshaus, Administrator of the Environmental Protection Agency, Defendants,

Exxon Corporation,
Intervenor-Defendant.

No. A82–254 CIV.

United States District Court,
D. Alaska.

July 24, 1984.

Jeffrey M. Eustis and Eric Smith, Anchorage, Alaska, for Trustees for Alaska.

Michael Spaan, U.S. Atty., Anchorage, Alaska, Laura L. Davis, Asst. Atty. Gen., Juneau, Alaska, Carl J.D. Bauman, Hughes, Thorsness, Gantz, Powell & Brundin, Thomas Meacham, Burr, Pease & Kurtz, Anchorage, Alaska, for defendants.

## MEMORANDUM AND ORDER

VON DER HEYDT, Chief Judge.

THIS CAUSE comes before the court on a number of pending motions, including plaintiffs' motion for a preliminary injunction and this court's order to show cause. In that show cause order the court requested the parties address the change in the factual situation that had occurred since the filing of plaintiffs' original motion for preliminary injunction.

### I. *Procedural Background*

Plaintiffs in this case are three public interest organizations. Plaintiff Nunam Kitlutsisti (a Yupik term meaning "Protectors of the Land") is a non-profit Alaska Native environmental organization formed to promote the health, safety and quality of life of its members, some of whom reside along the southern shore of Norton Sound. Plaintiff Cenaliulriit is the coastal resource service area board for the Yukon-Kuskokwim River delta region, part of which borders on Norton Sound. *See* Alaska Stat. ch. 46.40. Plaintiff Trustees for Alaska is an Alaskan non-profit environmental organization. Trustees for Alaska has members who use Norton Sound for recreation, wildlife observation, livelihood, and research.

Plaintiffs filed this action against Atlantic Richfield Co. (ARCO) in July 1982 under the citizen suit provisions of the Federal Water Pollution Control Act of. 1972 (FWPCA), 33 U.S.C. § 1365. The complaint sought to enjoin ARCO from drilling an offshore test well in Norton Sound for the reason that the Environmental Protection Agency (EPA) had not issued ARCO a NPDES permit for the drilling. Under the FWPCA, all discharge of pollutants into the nation's waters from point sources is illegal unless the discharger has a National Pollutant Discharge Elimination System (NPDES) permit. *See* 33 U.S.C. §§ 1311(a), 1342. The drilling of offshore wells involves the discharge of a large amount of pollutants into the water, including potentially toxic drilling muds used to lubricate the well shaft and drill bit. Therefore, offshore drilling operations require a NPDES permit to discharge pollutants.

ARCO admitted drilling the well without a NPDES permit. It responded, however, that it had applied for a permit but that the EPA refused to process the application, based on internal operating policies, and that EPA instead has issued a "letter of non-objection." This letter assured ARCO that if it would meet certain minimum discharge guidelines, EPA would forego pros-

ecution. ARCO thus argued that EPA was a necessary party under Rule 19 for the reason that plaintiffs' challenge in fact was not to ARCO's drilling but to EPA's operating policies. The court granted ARCO's motion for joinder and ordered plaintiffs to join EPA as a defendant.[1]

Plaintiffs filed a motion for preliminary injunction July 30, 1982 to enjoin further drilling in Norton Sound. This motion was not acted on prior to the cessation of drilling in September 1982. The motion subsequently was consolidated by the court with a motion for trial on the merits and is still pending, together with motions to dismiss filed by EPA and ARCO and various other motions. Prior to acting on these motions the court requested ARCO and EPA to inform it of the current status of drilling in Norton Sound. The responses of the parties indicated to the court the possibility that ARCO again would be drilling without a valid NPDES permit. The court therefore ordered defendants to show cause why drilling should not be enjoined in order to update briefing. After a hearing on the issue, the court on June 28, 1984 entered an order finding a NPDES violation and ordering certain relief. This memorandum explains the court's legal reasoning and addresses other outstanding motions.

## II. *Factual Background*

The material facts in this case are undisputed and accordingly all motions are ripe for decision. ARCO first applied for a NPDES permit to discharge drilling muds in Norton Sound March 2, 1981. EPA responded by letters dated May 8, 1981 and May 29, 1981. *See* Ex. "A", pp. 1 & 2, Federal Defendants' Answer to First Amended Complaint (Docket # 47). In one letter, the EPA stated:

We have determined that, for administrative reasons, this Agency will not issue NPDES permits for your proposed discharges at this time. This action should not be construed as either an approval or

denial of your requested authorization to discharge.

In a second letter, the EPA further stated:

Due to budgetary restraints, EPA is unable to issue your facility an NPDES permit during the time you plan on conducting the C.O.S.T. well drilling.

... If you commence discharge before an NPDES permit is issued, EPA will exercise its discretion not to prosecute ARCO for the discharge of waste water ... as long as the discharges comply with the requirements listed on Attachment A.

This promise of non-prosecution was reaffirmed in a letter to ARCO dated September 30, 1981.

ARCO started drilling in June 1982. Plaintiffs had previously notified ARCO, in a letter dated May 5, 1982, that discharges from ARCO's drilling would violate the FWPCA unless ARCO first obtained a NPDES permit. This letter was also forwarded to the EPA and State of Alaska, in compliance with the citizen suit requirement of 33 U.S.C. § 1365(b).

On June 7, 1982, the EPA issued a notice to ARCO labelled "Findings of Violation and Compliance Order." This order stated:

The application for the drilling of the C.O.S.T. well in Lease Sale 57 was received during a period of time when the NPDES permitting group in Region 10 was operating under an EPA Headquarters directive that said in effect that due to the limited resources of the Agency "major" permits or applications would be given priority in the NPDES permit issuance/reissuance process.

Application of the Headquarters directive (which included a rating criteria for classification of permits as major or minor) determined that ARCO Alaska's application for drilling operations in Norton Sound, Lease Sale 57, should be considered a "minor" application. Due to other Agency priorities, no minor NPDES permits were issued by Region

---

1. The other party to this litigation, Exxon, intervened as a defendant in response to this court's show cause order.

10 during the pendency of ARCO's application.

. . . .

For the time period beginning on June 3, 1982 and ending on November 1, 1982, the Respondent shall not discharge any pollutant into the waters of the United States, which includes Norton Sound, except in strict compliance with those terms and conditions set out in that document marked as attachment A which is attached hereto and made a part hereof by reference.

This order, issued under the EPA's enforcement authority contained in 33 U.S.C. § 1319(a)(3), applied restrictions to ARCO's drilling similar to those that would have been contained in a NPDES permit. However, this "short form" permit process allowed EPA to avoid the public hearing and other procedural requirements normally associated with permit issuance. *See* 40 C.F.R. part 124 (1983). Drilling continued until September 19, 1982.

In December 1983, the EPA issued a general permit for all exploratory drilling in Norton Sound. *See* Issuance of Final NPDES Permits, 48 Fed.Reg. 54881 (Dec. 7, 1983). This general permit, by its own terms, expired June 30, 1984. The reason for the quick expiration is that the general permit reflected "best practicable control technology" (BPT) requirements. *See* 33 U.S.C. § 1311(b)(1)(A). All permits effective after July 1, 1984 are required by § 1311(b)(2) to contain effluent limitations representing "best available technology economically achievable" (BAT). Thus, in order to comply with the FWPCA, EPA set a June 30 expiration date for the general permit.

At that time, in response to comments received, the EPA stated that no extension of the general permit would be possible:

*Comment:* EPA should develop a simple mechanism for reissuing the permits after or extending the permits beyond the June 30, 1984, expiration date mandated by section 301(b)(2) the Clean Water Act.

*Response:* At present we have no simple legal mechanisms for reissuing or extending these permits since they will have to be modified to reflect guidelines for best available technology economically achievable (BAT) after June 30, 1984. BAT guidelines are scheduled to be proposed in late 1983 or early 1984. Prior to the permit expiration date, we plan to evaluate the proposed regulations and to reissue these permits, incorporating our best professional judgment for the application of BAT requirements.

*Comment:* Will the permits be continued under the authority of Section 9(b) of the Administrative Procedure Act (APA), 5 U.S.C. 558(c) if EPA is unable to formally renew, extend or reissue these permits by June 30, 1984?

*Response:* Individual permits can be continued under the authority of APA. However, the provisions of this Act do not authorize EPA to continue general NPDES permits in a similar manner. The general permit does not require the permittee to submit an NPDES application, which is needed if the permit is to be continued under the APA.

48 Fed.Reg. at 54884. Nevertheless, EPA apparently must have informally informed ARCO and Exxon that individual NPDES permits would not be required for the period after June 30 as neither company applied for an individual permit. Instead, both ARCO and Exxon applied for coverage for their Summer 1984 drilling operations under the Norton Sound general permit. In response, the EPA granted coverage under the general permit. It further stated:

The present permit expires on June 30, 1984. We will be unable to reissue the permit by the expiration date, therefore, under the Administrative Procedures Act the present permit will continue in effect. [sic]

Letter from H. Green to E.D. Stout (May 1, 1984). Based on this coverage letters, both ARCO and Exxon started exploratory drilling prior to June 30, 1984 and are continuing their operations.

### III. *Preliminary Issues*

#### A. *Standing*

■ Defendants maintain that plaintiffs have no standing. This claim is without merit. *See Gonzales v. Gorsuch*, 688 F.2d 1263 (9th Cir.1982). The fact that ARCO potentially was and is discharging a large amount of pollutants into Norton Sound illegally, waters used by plaintiffs, is sufficient injury to create standing. Under the Clean Water Act, plaintiffs do not need to show that the discharges will cause irreparable harm to the environment or direct harm to themselves to maintain standing. *See id.*

#### B. *Motion to Dismiss Cenaliulriit*

ARCO has moved to dismiss Cenaliulriit on the grounds that, as a state-authorized agency, it cannot bring suit by itself, but must be represented by the state attorney-general. *See generally* Alaska Stat. §§ 46.40.110–.180 (authorization statute). It is unnecessary for the court to address this issue for the reason other plaintiffs have standing to bring the suit. As the motion requires the court to decide sensitive issues of state law, the court declines to address the motion at this time.

#### C. *Motion to Dismiss for Failure to Join EPA*

■ Plaintiffs' suit against the EPA named the Administrator and Regional Administrator as defendants, but not the agency itself. This is proper under 33 U.S.C. § 1365(a)(2). ARCO's argument that § 1365(a)(1) requires the EPA to be joined as a party is without merit.

#### D. *Mootness*

■ The court in an order dated November 2, 1982 held that plaintiffs' challenge to ARCO's drilling was not moot for the reason that the drilling was an activity capable of repetition, yet evading review. The court has reviewed the mootness issue in light of this court's interrogatory of May 4, 1984 and the parties' responses thereto. The court notes that the EPA has contin-
ued since 1982 to issue letters of non-objection or "minor-discharger" letters and has not abandoned the practice. Such letters have been issued as recently as October 21, 1983. Accordingly, the court finds the issues, being capable of repetition, are not moot.

### IV. *The 1982 NPDES Permit—Round I*

■ Initially, the court notes a substantial similarity between the actions of the EPA regarding the 1982 drilling and those regarding the 1984 drilling. Throughout, the EPA has been using "creative" administrative techniques of dubious legality to avoid a clear statutory mandate directed at the agency: that of issuing NPDES permits. The EPA's non-compliance with the statute has meant that third parties, the companies searching for needed petroleum reserves, have been needlessly subjected to citizen suits which they are powerless to avoid. It has also denied other users of Norton Sound's water resources their statutory right to comment on and object to those proposed discharges. And by allowing discharge of pollutants without the required permit, the EPA has frustrated the purposes of Congress, which created the NPDES permit system as "the key" to the policy of eliminating water pollution. *See, e.g., Weinberger v. Romero-Barcelo*, 456 U.S. 305, 319, 102 S.Ct. 1798, 1806, 72 L.Ed.2d 91 (1982). In light of the importance of NPDES permits to FWPCA, the court finds objectionable the government's argument that discharging pollutants without a permit involves merely "procedural" or "technical" violation of the law.

#### A. *EPA's Duty to Issue Permits*

Plaintiffs' suit against EPA alleges that the Administrator of EPA had a mandatory duty to process ARCO's NPDES permit. *See generally* 33 U.S.C. § 1365(a)(2) (allowing citizen suits against EPA when administrator has failed to perform mandatory duty). EPA, in its motion to dismiss, argues that it had administrative discretion not to process the individual permits for

the reason it was in the process of issuing a general permit at the time.[2] The court finds that plaintiffs' position is substantially correct.

■■■ NPDES permits are required to discharge any pollutants into the Nation's waters, and it is illegal for anyone to discharge except pursuant to a permit. *Weinberger*, 456 U.S. at 319, 102 S.Ct. at 1806. The Administrative Procedure Act, section 9(b), 5 U.S.C. § 558(c), states:

> When application is made for a license required by law, the agency, with due regard for the rights and privileges of all interested parties or adversely affected persons *and within a reasonable time, shall set and complete proceedings required to be conducted ... and shall make its decision.*

(emphasis added). In other words, when an action is illegal absent an agency-issued permit, the agency has a mandatory duty to act promptly upon license applications. *See* Legislative History of the Administrative Procedure Act, 79th Cong., 2d Sess. at 35 (*reprinting* Senate Judiciary Committee Print, June 1945); at 211 (*reprinting* Report of the Committee on the Judiciary, S.R. 79–752, Nov. 19, 1945); and at 275 (*reprinting* Report of the Judiciary, House of Representatives, H.R. 79–1980, May 3, 1946). Therefore, because NPDES permits are licenses required by law, § 9(b) of the APA makes it mandatory that the EPA promptly process such permits. *See Marathon Oil Co. v. EPA*, 564 F.2d 1253, 1260 n. 25 (9th Cir.1977); *see also Costle v. Pacific Legal Foundation*, 445 U.S. 198, 220 n. 14, 100 S.Ct. 1095, 1108 n. 14, 63 L.Ed.2d 329 (1980) ("under the Administrative Procedure Act, 5 U.S.C. § 706(1) [Los Angeles] may obtain judicial review of prolonged agency inaction with its application for a new permit").

■■■ EPA appears to argue that, so long as it was working on a general permit

covering the same discharges, it could use its administrative discretion not to process individual permits. There may be some instances where this is correct. However, it is evident here that EPA's decision not to process the individual permit meant that the applicant, ARCO, would not be covered by any permit. Given that there was no likelihood that the general permit would be issued in time, EPA had a mandatory duty to process ARCO's individual permit application.

### B. *ARCO is Subject to Citizen Suits*

#### 1. *ARCO Discharges Violated the FWPCA*

■■■ Under the FWPCA, the requirement that all discharges covered by the statute must have a NPDES permit is unconditional and absolute. Any discharge except pursuant to a permit is illegal. *See, e.g., Milwaukee v. Illinois*, 451 U.S. 304, 310–11, 101 S.Ct. 1784, 1788–89, 68 L.Ed.2d 114 (1981); *NRDC v. Costle*, 568 F.2d 1369, 1375 (D.C.Cir.1977). ARCO discharged pollutants into Norton Sound without a permit, and consequently, the discharges were illegal. ARCO's argument that EPA's § 1319 compliance order and letters were "the functional equivalent" of a NPDES permit is without merit.

#### 2. *EPA Cannot Insulate ARCO From Citizen Suits*

■■■ Plaintiffs assert that EPA's promise not to prosecute ARCO does not insulate ARCO from citizen suits. This is correct. Although EPA may exercise its discretion not to prosecute, ARCO is still subject to citizen suits. *Bethlehem Steel Corp. v. Train*, 544 F.2d 657, 661 (3d Cir.1976), *cert. denied*, 430 U.S. 975, 97 S.Ct. 1666, 52 L.Ed.2d 369 (1977); *Montgomery Environmental Coalition v. EPA*, 19 E.R.C. 1169, 1171 n. 6 (D.C.Cir.1983); *see also Sierra*

---

**2.** Although EPA promised in 1981 to issue a general permit, this permit was not issued until December 1983. *See 48* Fed.Reg. 54881 (1983). It is ironic that the general permit for Norton Sound, when finally issued, was valid for a period of less than seven months for a period when almost no drilling occurred. EPA now plans to issue a new general permit, incorporating BAT discharge criteria, in 1985.

*Club v. SCM Corp.*, 572 F.Supp. 828, 20 E.R.C. 1395, 1398 (W.D.N.Y.1983).[3]

### C. *Section 1319 Violation*

Plaintiffs also urge this court to declare that EPA was in violation of the FWPCA in purporting to authorize commencement and continuation of discharges without requiring a NPDES permit. *See* Plaintiffs' Amended Complaint. Elsewhere, plaintiffs have argued (1) that the court should hold that the effluent limitations contained in EPA's compliance order are unenforceable; (2) that EPA had a mandatory duty to enjoin discharges until ARCO obtained a NPDES permit; (3) that EPA had a duty to order ARCO to apply for a NPDES permit; and (4) that EPA violated the FWPCA by issuing a letter of non-objection and compliance order in place of a discharge permit.

■■■ Given the state of the pleadings currently before it, the court declines to address whether the EPA violated the FWPCA except in its failure to process ARCO's permit application. First, plaintiffs are unclear on the exact nature of the relief they seek, as in each succeeding memorandum they have argued a different theory. Thus, the issues have not been sufficiently sharpened for the court to address them. Second, under § 1365(a)(2), the only cause of action available to plaintiffs against the Administrator is for failure to perform a non-discretionary duty. This court may not have jurisdiction under either § 1365 or 28 U.S.C. § 1331 over the claim in plaintiffs' amended complaint that EPA's approval of drilling without a permit was illegal. *See Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) (limiting cause of actions under the FWPCA to those explicitly created by Congress); *Allegheny County Sanitary Authority v. EPA*, 557 F.Supp. 419, 427–28 (W.D.Pa.1983) *aff'd*, 732 F.2d 1167 (3d Cir.1984); *Love v. New York State*

*Department of Environmental Conservation*, 529 F.Supp. 832, 841 (S.D.N.Y.1981). *But see Hough v. Marsh*, 557 F.Supp. 74, 78 (D.Mass.1982).[4]

### V. *The 1984 Drilling—Round II*

No drilling occurred in Norton Sound in 1983. In 1984, both ARCO and Exxon planned exploratory wells for the area. As noted above, neither company applied for individual NPDES permits for their discharges. Both companies requested coverage under EPA's general permit for Norton Sound. The EPA granted coverage to both companies under the general permit. It further stated that "the present permit [the general permit] will continue in effect" under the terms of the APA. Plaintiffs challenged the legality of this continuance in their response to the court's interrogatory dated May 25, 1984.

### A. *Court of Appeals Jurisdiction: 33 U.S.C. § 1369*

■■■ Defendants initially contend that the district court does not have jurisdiction to address the legality of EPA's position that the general permit is continued under the APA. They claim that the EPA's letters stating that the permit would continue after June 30 were the issuance or reissuance of a permit, and accordingly the exclusive means of review is a suit initiated at the court of appeals level under 33 U.S.C. § 1369(b)(1)(F).

Whether EPA's grant of coverage under a general permit or notice of extension under 5 U.S.C. § 558(c) should be reviewed initially by the court of appeals is addressed neither by the FWPCA nor prior court cases. Functionally, these actions are similar to the issuance of a permit for the reason that in each case the EPA is granting approval for discharges. Nevertheless, the dissimilarities between the formal issuance or reissuance of a permit and

---

**3.** In its brief, EPA agrees with plaintiffs' position. Thus, EPA makes the curious argument that it had no duty to issue a permit, but nevertheless ARCO's discharges were subject to injunction by citizen suit.

**4.** Given that the parties have not briefed the issue, the court will not address it.

the more informal grant of coverage or notice of extension are great enough that this court finds that initial review of such actions must occur in the district court.[5]

The issuance or reissuance of a permit requires public notice, the opportunity for public comment, and the creation of an administrative record. The letter EPA issued to defendants approving their drilling was issued without notice, the possibility of adversary input, or the creation of a record. This difference in procedural posture indicates that initial review should not be at the court of appeals level. The purpose of creating initial court of appeals review is to create greater uniformity in permit decisions, avoid delay, and save procedural steps and time by avoiding duplication of effort. *See Crown Simpson Pulp Co. v. Costle,* 445 U.S. 193, 197, 100 S.Ct. 1093, 1095, 63 L.Ed.2d 312 (1980); *National Resources Defense Council v. EPA,* 673 F.2d 400, 405 n. 15 (D.C.Cir.), *cert. denied,* 459 U.S. 879, 103 S.Ct. 175, 74 L.Ed.2d 143 (1982); *Crown Simpson Pulp Co. v. Costle,* 599 F.2d 897, 905 (9th Cir.1979) (Renfrew, J., concurring), *rev'd,* 445 U.S. 193, 100 S.Ct. 1093, 63 L.Ed.2d 312 (1980) (per curiam decision adopting J. Renfrew's analysis); *Central Hudson Gas & Electric Corp. v. EPA,* 587 F.2d 549, 557 (2d Cir. 1978). While some of these purposes would be served by allowing original court of appeals jurisdiction, the factor of saving procedural steps and time is not served here by such review.

▮ No procedural steps are saved because the court of appeals will not have an administrative or factual record to review. It is only when the record has already been created by the agency that allowing district court review creates duplication. On the contrary, where there is no pre-existing administrative record, initial review at the district court level facilitates the creation of a record and thus expedites review of legal claims at the court of appeals level. Because the existence of an adequate record is so important to original jurisdiction in the court of appeals, many of the courts reviewing § 1319(b) have focused on this factor in determining the extent of jurisdiction under that section. *See National Resources Defense Council,* 673 F.2d at 405 n. 15; *Crown Simpson Pulp,* 599 F.2d at 906 (Renfrew, J., concurring); *Marathon Oil Co. v. EPA,* 564 F.2d 1253, 1263 (9th Cir.1977); *Save the Bay, Inc. v. Administrator of the EPA,* 556 F.2d 1282, 1291–92 (5th Cir.1977).[6] Therefore, because the letter of coverage and extension occurred without public notice and comment or the creation of an administrative record, § 1319(b) does not give jurisdiction to the court of appeals.

Two additional considerations support this conclusion. First, any extension of the permit under 5 U.S.C. § 558(c) occurs automatically as a matter of law. Thus, such an extension is not based on an "Administrator's action." Second, the EPA gave no public notice of its decision to allow drilling under the general permit. Given that § 1319(b) contains a 90-day statute of limitations, holding that review must occur under that statute may lead to unfairness due to such lack of notice. *See National Resources Defense Council,* 673 F.2d at 406–07.[7]

B. *60-Day Notice Requirement: 33 U.S.C. § 1365*

Defendants argue that, even if this challenge may be brought in the district court

---

5. Initially, the court notes that § 1369, allowing for initial review in the court of appeals, must be strictly construed. *Pacific Legal Foundation v. Costle,* 586 F.2d 650, 654 (9th Cir.1978), *rev'd on other grounds,* 445 U.S. 198, 100 S.Ct. 1095, 63 L.Ed.2d 329 (1980).

6. The Supreme Court in *Crown Simpson Pulp* indicated that while the EPA's veto of a state-issued permit is an "Administrator's action" within the meaning of § 1319(b), the EPA's failure to object to such a permit may not be. *See* 445 U.S. at 196 n. 9, 100 S.Ct. at 1095 n. 9; *Crown Simpson Pulp,* 599 F.2d at 907–08 (Renfrew, J., concurring). The reason for this distinction is most likely that one decision is based on an administrative record, the other is not.

7. *See also Menzel v. County Utilities Corp.,* 712 F.2d 91 (4th Cir.1983) (allowing § 1365 citizen suit challenging whether NPDES permit could be given retroactive application).

under 33 U.S.C. § 1365, the court has no jurisdiction because plaintiffs failed to provide them with the 60-day notice required by § 1365(b). Central to this argument is the proposition that ARCO's discharging without a permit under a § 1319 compliance order and promise of non-prosecution in 1982 is a substantially different violation than discharging under a permit illegally extended under 5 U.S.C. § 558(c) in 1984. In other words, because the 1984 violation is based on different legal theories than the 1982 violation, plaintiffs were required to resupply defendants with a 60-day notice of citizen suit.

 This argument fails for two reasons. First, § 1365(b) only addresses the *commencement* of an action without notice. It does not ban plaintiffs from introducing new legal arguments in *continuing* litigation based on changed underlying circumstances. Second, § 1365(b) should be interpreted pragmatically by the courts, not as a technical roadblock to citizen suits. So long as plaintiffs substantially comply with its terms, courts may assume jurisdiction of the dispute. *Pymatuning Water Shed Citizens for a Hygienic Environment v. Eaton*, 644 F.2d 995 (3d Cir.1981); *South Carolina Wildlife Federation v. Alexander*, 457 F.Supp. 118, 123 (D.S.C.1978); *Village of Kaktovik v. Corps of Engineers*, 12 E.R.C. 1741, 1744 (D.Alaska 1978) (von der Heydt, J.). Given that plaintiffs' central complaint in both 1982 and 1984 was that ARCO was discharging pollutants without a valid NPDES permit, the court finds that plaintiffs' 1982 notice substantially complies with the requirements of § 1365(b). To require plaintiffs to file a new 60-day notice at this point would not in any way further the purposes of the 60-day notice requirement, *i.e.*, to allow the EPA to initiate action or to allow possible administrative resolution of the claim. *See, e.g., Alexander*, 457 F.Supp. at 124; *Save Our Sound Fisheries Ass'n v. Callaway*, 429 F.Supp. 1136, 1142–44 (D.R. I.1977). In this case, EPA and the dischar-

gers have not even hinted that they would attempt to correct the legal deficiencies with the permit. Therefore, any difference in legal theory was of no practical interest to defendants except as an argument to delay this lawsuit.[8]

## C. *Extension of NPDES Permit Under 5 U.S.C. § 558(c)*

The final issue is whether the NPDES permit for ARCO and Exxon was validly extended after June 30, 1984. Defendants argue that § 9(b) of the Administrative Procedures Act, 5 U.S.C. § 558(c), operates to extend the expired general permit until such time a new general permit is issued. In pertinent part, that section reads:

> When the licensee has made timely and sufficient application for a renewal or a new license in accordance with agency rules, a license with reference to an activity of a continuing nature does not expire until the application has been finally determined by the agency.

For the reasons stated below, this section does not operate to extend the Norton Sound general permit.

### 1. *Permit Not Extended by Agency Action*

 EPA's letter to Exxon and ARCO was not an agency action extending the NPDES general permit. For EPA to take any action extending a NPDES permit, EPA must at a minimum provide for public notice and an opportunity for a public hearing. *See Costle v. Pacific Legal Foundation*, 445 U.S. 198, 100 S.Ct. 1095, 63 L.Ed.2d 329 (1980); 40 C.F.R. part 124 (1983); *id.* §§ 124.10(a), 124.10(c)(i). Given that EPA did not follow any administrative procedures in holding that § 558(c) extended the permit, it is clear that EPA did not intend to extend the permit by formal agency action. Nor would EPA have the authority to do so. The FWPCA would prohibit any agency action regarding the permit that did not implement the FWPCA's 1984 BAT technology standards. EPA sim-

---

**8.** Exxon voluntarily intervened in this suit. It therefore steps into the shoes of ARCO for pur-

poses of the 60-day notice requirement. It cannot now argue it never received notice.

ply cannot issue a permit not in compliance with those standards. *See, e.g.,* 40 C.F.R. §§ 122.44, 122.46(e) (1983); *Monongahela Power Co. v. EPA* 586 F.2d 318, 319 (4th Cir.1978); *Republic Steel Corp. v. Costle,* 581 F.2d 1228 (6th Cir.1978) (Republic Steel II), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1219, 59 L.Ed.2d 457 (1979).

## 2. *General Permits Cannot be Extended by Operation of Law*

The EPA has not argued that it extended the Norton Sound general permit by agency action. Instead, it has asserted that § 558(c) automatically extends the permit without agency action by operation of law.

■■■■ Section 558(c), however, does not allow for the extension of a NPDES general permit. First, § 558(c) only applies to "license[s] required by law." When a license is required, then, as noted above, the agency has a mandatory duty to act on the license application. The purpose of the "extension" language in § 558(c) is to protect the license applicant when the agency is slow in performing such a mandatory duty. When, however, the agency has no duty to act on a license, as is the case with a general permit, *see* 40 C.F.R. 122.28(a) (1983), the applicant has no legally protected expectation that the agency will issue the permit. Because the applicant has no protectable interest, there is therefore no need to protect him or her from agency inaction. In fact, EPA may delay indefinitely in issuing a new general permit. To allow § 558(c) to extend a general permit would thus result in giving the agency the ability to avoid indefinitely the permit procedures required by the FWPCA, allowing it to extend a permit by inaction. Consequently, because the EPA has no duty to act on general permits, they are not licenses "required by law" within the terms of § 558(c). This result does not cause unfairness to license applicants since they always have the opportunity to apply for individual NPDES permits.

■■■■ Second, § 558(c) requires that the licensee "has made a timely and sufficient application for a renewal or a new license in accordance with agency rules." In other words, the applicant's right to an extension vests only upon the completion of a legally sufficient application. The EPA does not have rules for applying for a renewal of a general permit, *see, e.g.,* 40 C.F.R. §§ 122.-21; 124.3(a) (1983) (application requirements), and it is questionable whether such an application is possible, since general permit issuance rests totally in the agency's discretion. Given that no application for a general permit is possible under agency rules (and in any event none exists in this case) it is doubtful that § 558(c) could apply.

Last, the EPA's own regulations indicate that § 558(c) should only apply to individual permits. *See id.* § 122.6. Although not determinative of the issue, the fact that agency regulations allow for § 558(c) extensions for individual permits, but contain no parallel provision for general permits, indicates that EPA did not intend § 558(c) to apply.

The letters from Exxon and ARCO requesting coverage under the general permit are not applications within the meaning of the statute. First, a letter requesting coverage is not an application. *See id.* § 122.21, 124.3(a).

■■■■ Second, any application must be a "sufficient" application. In this case, ARCO and Exxon applied to continue operation under BPT standards. Since EPA could not issue any permit for after June 30 that did not provide for BAT standards, EPA could not legally grant the applications and the applications therefore weren't "sufficient." *See Bankers Life and Casualty Co. v. Callaway,* 530 F.2d 625, 634 (5th Cir.1976) (§ 558(c)) doesn't apply where application has substantive problems), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Federal Power Commis-*

*sion,* 510 F.2d 198, 204 n. 21 (D.C.Cir. 1975).[9]

The court therefore concludes that because the NPDES general permit expired June 30, 1984 and § 558(c) does not operate to continue the statute, all discharges from ARCO's and Exxon's wells into Norton Sound after that date are illegal under the FWPCA.

As noted above, as a remedy for this violation, the court entered an earlier order, dated June 28, 1984. That order required ARCO and Exxon to follow the BAT technology guidelines contained in Bering and Beaufort Sea NPDES general permit. *See* 49 Fed.Reg. 23734 (June 7, 1984). In addition, it ordered that no drilling should occur in Norton Sound after January 1, 1985 unless new general or individual NPDES permits have been issued. Because ARCO and Exxon have to date substantially attempted to comply with all NPDES permit requirements, but were denied permits due to EPA inaction, the court declined to enjoin all drilling immediately.

Accordingly, IT IS ORDERED:

(1) THAT ARCO's motion to stay proceedings, Docket # 83, is denied;

(2) THAT ARCO's motion to strike, Docket # 65, is denied;

(3) THAT the government's motion to extend time, Docket # 56, is granted;

(4) THAT ARCO's motions to dismiss, Dockets # 42 and # 49, are denied;

(5) THAT the government's motion for summary judgment is denied;

(6) THAT plaintiffs' motion for preliminary injunction, now a motion for judgment on the merits, is granted as follows. The court holds:

(a) THAT ARCO's drilling in 1982 and Exxon's and ARCO's drilling after June 30, 1984 was and is in violation of the FWPCA, 33 U.S.C. §§ 1311 and 1342.

(b) THAT the Administrator of the EPA failed to perform a non-discretionary duty

in failing to process ARCO's 1981 NPDES permit application for Norton Sound.

Plaintiffs' motion is otherwise denied.

(7) THAT the injunction entered in the June 8, 1984 order shall stay in force and effect until further order of the court.

(8) The Clerk shall prepare a partial final judgment incorporating Item No. 6 of this order and Items Nos. 1–3 of the court's June 28, 1984 order. *See* Fed.R.Civ.P. 54(b). Final judgment is not proper for the reason that plaintiffs' claim under § 1319 against the EPA remains unresolved.

---

**9.** This opinion does not address whether individual NPDES permits may be continued under the terms of § 558(c). There is some authority that the section might control despite existence

of the mandatory June 30, 1984 BAT deadline. *See Pan-Atlantic Steamship Corp. v. Atlantic Coast Line Railroad Co.,* 353 U.S. 436, 77 S.Ct. 999, 1 L.Ed.2d 963 (1957).