**UNITED STATES of America, Plaintiff,**

v.

**BOARD OF TRUSTEES OF FLORIDA KEYS COMMUNITY COLLEGE, et al., Defendants.**

**No. 80–2894–Civ–CA.**

United States District Court,
S. D. Florida.

Sept. 3, 1981.

David E. Dearing, Dept. of Justice, Washington, D. C., Michael Mitchell, Asst. U. S. Atty., Miami, Fla., for plaintiff.

David Paul Horan, Key West, Fla., for defendants.

## MEMORANDUM OPINION

ATKINS, Chief Judge.

THE ABOVE CAUSE was before the Court for a non-jury trial on May 18, 19 and August 3, 1981.

The United States seeks restoration of an open water slough on the edge of the Florida Bay, which it contends was filled by defendants in violation of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403 and the Clean Water Act, 33 U.S.C. §§ 1311, 1344. Defendants concede the failure to obtain a necessary federal permit for the fill work. Defendant Charley Toppino & Sons, Inc. contends it should not be held liable for any of the unauthorized work since it relied on the defendant Board of Trustees to obtain the permits and performed the construction work in question while believing the permits had been obtained. Defendant Board of Trustees contends that the violation was not intentional and that the remedy urged by the United States is unwarranted.

Jurisdiction over the cause is predicated on the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 406 and the Federal Clean Water Act, 33 U.S.C. § 1319(b) and 28 U.S.C. §§ 1345, 1355.

The central legal issues—Charley Toppino & Sons' liability and the nature and extent of any remedy—are relatively narrow. The dispute brings to mind the popular maxim, "Beauty is in the eye of the beholder." Here, one party's unsightly swamp was another party's endangered wildlife refuge. Resolution of the dispute requires inquiry into the background of the unauthorized activity (Section I) and its effect on the environment (Section II). Section III discusses liability while Section IV sets forth the mandated remedy. The findings of fact and conclusions of law which are required by Rule 52, Fed.R.Civ.P., are incorporated herein.

### I.

The Board of Trustees for the Florida Keys Community College (hereafter referred to as defendant Board) is a corporate body authorized by the State of Florida to conduct the business of operating Florida Keys Community College, which is located on Stock Island, Monroe County, in the Southern District of Florida. Defendant Charley Toppino & Sons, Inc. (hereafter Toppino) is a construction company organized under the laws of the State of Florida and doing business within Monroe County.

The Board holds legal title to the Stock Island campus of the College. The Board's original plan called for the installation of "riprap," a line of large rocks and boulders as a barrier against erosion of the northeastern wall of an embayment located on the southwestern edge of the campus. The original plan was the subject of a permit which authorized placement of approximately 800 feet of riprap and which permitted removal of approximately 150 feet of mangroves along the northeastern edge of the slough. See Government Exhibit 43. This permit was issued by the Florida Department of Environmental Regulation on April 12, 1977. A federal permit, number 77K–0192, was issued July 1, 1977 for the same project. Neither of these permits authorized any filling of the shallow water pocket or slough depicted in Government Exhibit 43.

During 1977, the College's director of resource development and planning was Mr. William Ceely. During April of 1977, the site was visited by Mr. Robert Mannix, a field inspector for the Florida Department of Environmental Regulation. After meeting with Mr. Mannix at the site and apparently as a result of their conversations, Mr. Ceely came to the understanding that the

State of Florida would be receptive to a modification of the riprap project so as to seal off the open end of the slough with ripprapping and fill in the pocket with dirt. According to Mr. Ceely, Mr. Mannix "suggested" the fill project as a reasonable means to eliminate the slough which was described by Mr. Ceely as an unhealthy area, a debris trap. Mr. Mannix denied that any specific recommendation was made to Mr. Ceely. Despite the disparity as to the origin of the filling plan, it is apparent that Mr. Ceely was correct in his impression that the state would not be hostile to the modification. On April 15, 1977, Mr. Ceely sent a letter to Robert Mannix in which he submitted architectural drawings of the proposed revision of the riprap project to include filling of the slough. The materials were transmitted to the appropriate office of the Florida Department of Environmental Regulation, which on August 25, 1977 issued a state permit and certified the water quality for the modified project. As modified, the project included the filling and bulkheading of the entire slough.

No application for a federal permit for the riprap project as modified was ever made by the Board nor did there exist a procedure whereby the State automatically referred state applications to appropriate federal officials. There was discussion during mid 1977 about the creation of a joint application procedure. However, the procedure which would have permitted the filing of a joint state and federal permit application, was not to be effective until September 1, 1977. See Government Exhibit 62. The decisions would continue to be made separately by the state and federal agencies involved.

In the college's chain of command, the most direct responsibility for obtaining necessary permits rested with Mr. Ceely, who in turn reported directly to the college's president. Mr. Ceely testified that throughout the period in question he was aware that separate state and federal permits were required and that it was his experience in the past that state approval was closely followed by issuance of a federal permit. He testified that Mr. Mannix

had led him to believe that Mr. Mannix would process the state and federal permits—that Mr. Mannix would submit any necessary federal application. Mr. Mannix denied such a representation.

It is this Court's finding that no representations were made by Mr. Mannix that he would secure the necessary federal permit. Despite this finding, it is possible that Mr. Ceely sincerely believed a separate federal application was unnecessary—or that he negligently failed to submit one. Clearly any belief that a separate application was unnecessary was mistaken. More importantly, as discussed in Section III, Mr. Ceely was also mistaken as to the existence of all necessary federal permits at the time construction was begun. This Court concludes that whatever factual predicate may have existed for Mr. Ceely's failure to submit an application for the federal permit, it did not justify or supply a reasonable explanation for the decision to take action on the modified project when no federal permit had been received. Despite his confusion over the application process, Mr. Ceely acknowledged that he was aware that separate state and federal permits were required and that he had received no federal permit for the work.

In plaintiff's post-trial briefing, the Government urges that a chronological review of the documents submitted to the various agencies reveals a conscious effort on Ceely's part to deceive the Corps by pretending that it intended to proceed only with the original project. This Court is not persuaded that such a plan or intent is revealed. The Court's observation of Mr. Ceely at trial leads it to conclude that although he demonstrated a tendency to rationalize his actions and to place blame on other persons, his failure to submit the separate application was not a willful attempt to avoid the law.

Sometime in 1977, prior to October 5, Toppino installed riprap boulders across the mouth of the slough. Its actions were in accordance with its contract with the college. There was a factual issue at trial as

to whether Toppino was aware that a necessary federal permit for the modified project had not been obtained. Frank Toppino, president of the defendant company, testified that in the past he had always relied on the college to obtain any necessary permits. Review of the bid documents reveals the college's representation to bidders that "the college will be responsible for acquiring State of Florida Department of Environmental Regulation and Army Corps of Engineers permits necessary for construction of this project." *See e.g.* Government Exhibit 5 at page 6. Mr. Toppino acknowledged his awareness of the state and federal permit requirements and of their importance with respect to dredge and fill work in the Florida Keys. In summary, this Court finds that although defendant Toppino was aware that the federal permit was a necessary prerequisite to construction, it relied on the College to obtain it, and assumed it had been obtained when told by the College to commence construction of the riprap across the mouth of the slough.

On or about October 5, 1977—subsequent to the installation of the riprap boulders but prior to removal of the mangroves or filling of the slough, Mr. Charles Schnepel, a biologist employed by the Corps of Engineers, visited the site and noted that the work under construction did not conform to the federal permit issued in July. Government Exhibit 18 depicts the area as it existed on that date. An airplane flight by Mr. Schnepel over the area in December of 1977 revealed that no additional work had been done on the site. A second flight during April of 1978 revealed that the slough had been filled. Mr. Schnepel made reports to his superiors following each of these observations. During May of 1978, Mr. Schnepel again visited the site, this time talking with Mr. Ceely. According to Mr. Ceely, it was at this time that he first learned that the work was in violation of federal permit requirements, that the necessary permits had not been obtained. Additional work after May 1978 was performed in the area including grading and the placement of a top fill of white crushed rock.

The Corps of Engineers issued a cease and desist notice on September 19, 1978. See Government Exhibit 28. The Government did not prove that any substantial work on the former slough was performed after the cease and desist order.

On March 7, 1979, a short form application was submitted to the Corps of Engineers seeking a permit to install storm drainage outfalls for the purpose of draining the parking lot area of Florida Keys Community College. Three of the five outfalls for which permits were being sought involved drainage from the roof of the Tennessee Williams Fine Arts Center which was under construction. On April 30, 1979, the Corps of Engineers returned the storm water outfall application, stating that the Corps could not accept or process the application because of the prior unauthorized work. The outfalls were subsequently activated despite this response and continue to be in operation.

II.

The Government's assessment of the environmental damage caused by the filling of the slough was testified to by Mr. Schnepel and by Dr. Arnold Banner, an environmental specialist for the United States Fish and Wildlife Service with an impressive educational background in wildlife conservation and marine biology. Dr. Earl Rich, a professor of biology and population ecology at the University of Miami, testified on behalf of the defendants. In large measure the Government's experts and the defendant's expert were in agreement about the environmental damage occasioned by the filling of the slough. Dr. Rich's major departure was his view that restoration of the original slough did not promise sufficient environmental benefit to warrant the expense and property loss to the College. The experts' testimony and the Court's review of the numerous photographs of the site indicate the following effects arising out of the College's activities.

The slough was a shallow water pocket, approximately one to one and a half feet in depth. Prior to the filling, the edges of the

slough supported a healthy fringe of mature red and black mangroves, approximately ten feet in height and seven to eight years old. The bottom of the open area of the slough was well vegetated, including two types of submerged sea grasses (by the common names of turtlegrass and shoal weed) and beneficial algae. This type of bottom vegetation is an important food source for fish and wading birds while the mangroves provide shelter for developing fish and wildlife. The placement of the riprap and the filling of the slough destroyed an area between one-third to one-half acre in size which had a beneficial environmental impact and which was important to the Florida Keys as a whole. As is revealed in Government Exhibit 58, it was one of the few areas on the northeastern side of Stock Island which supported a mature stand of mangroves, the associated sea grasses and shallow water feeding area. Based on the testimony of John Hendry, Chief Cost Estimator for the Corps of Engineers, the cost of (1) removal of the riprap barricade and fill material, (2) the removal of the parking lot drainage pipes, (3) the relocation of the power line, (4) the proper substrata preparation, and (5) replanting the restored slough with mangroves and sea grasses would involve a total cost to the College of approximately $12,000.00. No challenge to this figure was presented by defendants. See Government Exhibit 48. In setting forth these findings of fact, the Court concurs in the Government's view that the original slough was an environmentally significant area, deserving of protection and significant remedial action by defendants.

The Board contends that the original slough was a debris trap for unhealthy trash, including old tires, and provided shelter for rats from a nearby dump. The Court notes from its own view of the area during trial, that the larger debris—tires and such—appears to have been brought into the area by students or persons improperly using the area as an informal dump. The ordinary wave action did not appear to be sufficient to move large trash into the original slough or the curved area of the embayment as it presently exists. Based on the evidence, it is reasonable to assume, and the Court therefore finds, that the slough did serve to entrap organic sediment. The area may have had an unpleasant odor and appearance because of the decaying process, a beneficial process in the ecological chain of the area.

The Board argues strenuously that its failure to obtain a federal permit for the modified project was not intentional, involving what was merely a "technical" violation for which no restoration or mitigation is warranted. The Board contends that any adverse effects of destruction of the slough are offset by the College's beneficial use of the increased land space for a public education purpose. Alternatively, argues the Board, there are other areas on the campus for replanting of mangroves and shallow water development which constitute satisfactory mitigation of any damage which occurred, while avoiding the cost and hardship associated with restoration of the original slough.

The defendants identified primarily two areas for mitigation. The first area was the circumference of large rectangular fill pads north of the slough area, where the College previously conducted a mangrove planting experiment in conjunction with or as an aspect of a Navy study. Dr. Rich discussed this area as an alternative site for a mitigation project. The defendants' proposal was to use equipment to prepare the submerged edges of these pads to facilitate rooting of the trees, to plant additional mangroves, and, if necessary, to erect a shallow barrier reef offshore to reduce wave action and provide additional protection for the young plants. During the trial, the Court viewed the area, including the location of the previous mangrove project begun in 1977. Although it seems clear that the barren fill pad area could become more productive to the environment if mangrove planting on its edges were successful, the Court finds the previous mangrove planting project begun in 1977 and reported in defendants' Exhibit 3, had only limited success. The Court has admitted the NOSC

report to the extent permitted by Federal Rule of Evidence 803(18), as utilized by Dr. Rich in formulating his opinion. Viewing of the southwestern side of the fill pad revealed a minimal survival note and little growth among the planted trees. One portion of the northeastern side did support a fairly healthy stand of black and red mangroves because of protection provided by an offshore island. Significantly, the area does not provide a suitable location for development of submerged sea grasses or the shallow water feeding area provided by the original slough.

A better mitigation location identified by the parties was an "L" shaped pocket of water on the eastern side of the campus. In its present state the pocket supported mature mangroves. Their growth and the utility of the area was impaired by the existence of a derelict houseboat docked in the inlet. To create an area comparable to the original slough, the pocket's shape and depth could be modified to support submerged sea grasses and to provide shelter for fish development and a feeding site for wading birds. There was also discussion of removal of or alteration of a sanitation system located near the site, to provide a more advantageous or less destructive use of the system's sewage discharge.

There was also limited testimony by the Government's experts of their opinion as to the effect of the storm outfalls. It was testified that the drainage from parking lots would contain substances which were damaging to the water quality. No measurements or samples had been taken, nor were alternatives suggested by the Government. Viewing of the area revealed that even in the absence of the drains, the relatively nonporous nature of the nearby parking area would result in any rain causing flooding and possible runoff into the same waters. Although the construction and utilization of the storm outfalls undoubtedly had some adverse effect on the area, the Court finds there was insufficient evidence on which to base a separate finding of environment damage which would support a restoration order. Therefore, the Court will treat the issue as being inseparably tied to the question of restoration of the slough itself.

## III.

The Rivers and Harbors Appropriation Act of 1899 of 33 U.S.C. § 403 makes it unlawful to:

1) create an obstruction to the navigable capacity of any of the waters of the United States;

2) build any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, haven, harbor, canal, navigable river or other water of the United States, outside of established harbor lines or where no harbor lines have been established; or

3) excavate or *fill, or in any manner to alter or modify the course, location, condition, or capacity of any port, haven, harbor, canal, . . . or of the channel of any navigable water of the United States*

unless the work has been approved by the Army Corps of Engineers. (Emphasis added). *See also* 33 U.S.C. § 406 (Enforcement).

The Federal Clean Water Act at 33 U.S.C. § 1311(a) declares that "the discharge of any pollutant by any person shall be unlawful," except as provided for within the Act. The term "pollutant" includes "dredged spoil, . . . rock, sand [and] cellar dirt . . . discharged into water[s]" of the United States. *See* 33 U.S.C. § 1362(6).

 It is clear to this Court that the embayment and slough, adjoining the Florida Bay, were navigable waters of the United States within the meaning of the two statutes. *See United States v. Joseph G. Moretti, Inc. (Moretti I)*, 478 F.2d 418 (5th Cir. 1973). The placement of the riprap and the filling of the slough, without the necessary federal permits constituted violations of both the Rivers and Harbors Appropriation Act of 1899 and the Federal Clean Water Act. Defendants' suggestion at trial that the Government's delay in issuing a cease and desist order should estop them

from enforcing the statutes is without merit. *See Weiszmann v. District Engineer,* 526 F.2d 1302, 1305 (5th Cir. 1976).

Defendant Board appears to concede, and this Court specifically finds, that the installation of the modified riprap plan and the filling of the slough were executed with the Board's knowledge and implicit consent. It is clear that Mr. Ceely was acting with at least the implied authorization of the Board. While the prospects of a "joint application" process may have had some factual role in Mr. Ceely's actions, the Court finds that the Board, through its agent Mr. Ceely, authorized the commencement of the construction despite the absence of the necessary federal permit. Such action, even in the face of a good faith but mistaken belief that a federal permit would eventually be issued under the joint application process, constitutes "self-help for the impatient," a practice which is specifically disapproved by this circuit. *Moretti I, supra* at 427; *Weiszmann v. District Engineer, supra* at 1305.

■■ Defendant Toppino contends that liability for civil violation of the statutes in question requires proof of at least a "general intent" to violate the law, citing *United States v. Commodore Club, Inc.,* 418 F.Supp. 311 (E.D.Mich.1976). Toppino argues that its reliance on the College to obtain the necessary permits was reasonable, thereby precluding a finding of "general intent" to violate the law. Whatever the indemnification effect of the College's contract, this Court is not persuaded by the argument that Toppino may avoid liability because of good faith reliance on the College's representatives. Civil liability under the Federal Water Control Act is not limited to intentional violations. "The regulatory provisions of the FWPCA were written without regard to intentionality, . . . making the person responsible for the discharge of any pollutant strictly liable. . . . Willful or negligent violations of the Act are separately punishable by criminal penalties under 33 U.S.C. § 1319(c)(1). The Act would be severely weakened if only intentional acts were proscribed." *United States v. Earth Sciences, Inc.,* 599 F.2d 368, 374 (10th

Cir. 1979), *cited with approval at, Sierra Club v. Abston Construction Co., Inc.,* 620 F.2d 41, 46 (5th Cir. 1980). A comparable standard of strict liability exists under the Rivers and Harbors Act. *See United States v. King Fisher Marine Service,* 640 F.2d 522, 523 (5th Cir. 1981), *citing, Zabel v. Tabb,* 430 F.2d 199, 207 (5th Cir. 1970), *cert. denied,* 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971). Thus, civil liability under the statutes is predicated on either (1) performance, or (2) responsibility for or control over performance of the work, in the absence of the necessary federal permit. *Cf.* 33 C.F.R. §§ 326.1–326.5 (regulations governing Corps of Engineers' enforcement procedures and authority to require cooperation of "all persons responsible for and/or involved in the performance of the [unauthorized] activity." ). The mandatory nature of the statutes is consistent with the Congressional interest in preventing the destruction of natural resources which may be difficult or impossible to restore, and of eliminating pollution from the nation's waters. *United States v. Earth Sciences, supra* at 373. Nor does the application of the statutes impose an unreasonable burden on construction companies. The companies may protect themselves merely by requiring a copy of the necessary permits to be shown to them prior to commencement of the work. The case cited by defendant, *United States v. Commodore Club, Inc., supra,* involves a criminal prosecution and is not relevant to the issue of the Government's burden during a civil enforcement action. Indeed, despite its conclusion that criminal liability requires proof of at least a general intent to violate the Rivers and Harbors Appropriation Act of 1899, the district court suggested that "effective remedies can be achieved through injunctive action against offending parties." *Id.* at 320.

■ Having resolved the question of liability, the Court now turns to the question of the appropriate remedy. It is clear that under the Rivers and Harbors Appropriation Act of 1899, the Court is empowered to issue a mandatory injunction requiring total restoration of the original site despite a

showing of significant expense. *Moretti I, supra* at 431. The Government urges that where an unlawful filling has occurred, a court should order total restoration of the original site, provided it is "feasible" citing *United States v. Sexton Cove Estates, Inc.,* 526 F.2d 1293 (5th Cir. 1976); *Weiszmann v. District Engineer, supra;* and *United States v. Joseph G. Moretti, Inc. (Moretti II),* 526 F.2d 1306 (5th Cir. 1976). I conclude, however, that the Court has somewhat greater latitude in determining the appropriate remedy. In *Moretti II,* it was noted that even where there was a flagrant violation of the law, the remedy must be "based upon a complete examination of both the environmental factors involved and the practicalities of the situation." *Id.* at 1310. In *Sexton Cove, supra,* it was cautioned that while a restoration plan must be carefully designed to confer maximum environmental benefits, the law must be tempered with a touch of equity. *"The degree and kind of wrong* and the practicality of the remedy must be considered in the formulation of that remedy." *Id.* at 1301. (Emphasis added). *See also United States v. Sunset Cove, Inc.,* 514 F.2d 1089 (9th Cir. 1975).

It is clear to this Court that despite the small area involved, serious environmental damage was caused by defendants' actions in destroying the slough. In light of the fairly reasonable cost of restoration as testified to by the Government and the evidence of a significant likelihood of success, the Court would have little hesitation in ordering restoration of the original were it not for additional factors which argue in favor of an alternative plan. *First,* in contrast to the egregious violations documented in *Moretti* and *Weiszmann,* this court concludes the instant violations were negligent rather than willful. *Second,* future violations may be deterred by imposition of a monetary penalty under the Federal Clean Water Act. *See* 33 U.S.C. § 1319(d). *Third,* while clearly not a defense to liability, the filled land serves a public as opposed to a private purpose. *Fourth,* despite the

clear environment importance of the slough, there were adverse factors associated with it in terms of appearance and effect on the College's use of the adjacent land. *Finally,* and most significantly, there is an alternative area capable of development and enhancement which offers a significant opportunity for mitigation. While none of the points standing alone would dissuade this Court from ordering restoration of the original slough, their combination is persuasive of an alternative approach.

Based on the foregoing discussion this Court hereby

(1) imposes a fine of $3,000.00 on defendant Charles Toppino & Sons, Inc. pursuant to 33 U.S.C. § 1319(d).

(2) imposes a fine of $15,000.00 * on defendant Board of Trustees. 33 U.S.C. § 1319(d). In addition, defendant Board of Trustees shall remove the houseboat from the L-shaped embayment on the eastern side of the campus and shall do such planting, modification and bottom work as is necessary to provide a beneficial environmental area which is comparable to that of the now-destroyed slough. Defendant Board of Trustees shall have thirty (30) days from the file date of this Order to prepare a detailed written plan for the above-described mitigation project, including an assessment of cost, time and personnel necessary for its completion. The description will include a cost assessment for Dr. Banner's proposal for alteration or movement of the sewage disposal system on that location. The Government shall respond to the plan within 15 days of receipt, noting any proposals for change or modification, the purpose of such modifications and an assessment of the cost, time, and personnel necessary for completion.

(3) As an alternative to (2) above, and at the election of the defendant, the defendant shall restore the slough to its original course and capacity, with the exception that the riprapping may be extended along its

---

* The Court is aware of the appraisal of the filled land at $63,000 and the Government's contention that a fine should be analogous to this figure. The Court does not believe a higher fine is warranted on the instant facts where affirmative mitigation is also required.

northeastern edge, in conformity with the Corps of Engineer Permit Number 77K–0192. Replanting of mangroves and submerged grasses will be required. In the event of an election (written notice of which shall be filed within ten days of the file date of this Order), the fine imposed pursuant to 33 U.S.C. § 1319(d) will be reduced to $3,000.00.

Pursuant to Rule 54, the Clerk of the Court is hereby directed to enter a separate final judgment on behalf of plaintiff United States of America and against defendants Board of Trustees and Charley Toppino & Sons.