ORANGE ENVIRONMENT, INC.,
Arthur E. Soons and Sandra
Soons, Plaintiffs,

Hudson Riverkeeper Fund, Inc.,
Plaintiff Intervenors,

v.

COUNTY OF ORANGE,
et al., Defendants.

No. 91 Civ. 8688 (GLG).

United States District Court,
S.D. New York.

Jan. 20, 1993.

See also 145 F.R.D. 320.

Michael H. Sussman, Goshen, NY, for plaintiff Orange Environment, Inc.

Jeffrey P. Soons, Charlottesville, VA, for plaintiffs Arthur and Sandra Soons.

Natural Resources Defense Council (Robert F. Kennedy, Jr., of counsel), and John Jay Legal Services, Inc., White Plains, NY (Steven P. Solow, of counsel), Daniel E. Estrin, Alexander DeSevo, George Pavarini, Timothy E. Shanley, Lisa Thompson, Athena Tsakanikas, Nicholas Ward-Willis and Marla E. Wieder, Law Students, for

intervenor-plaintiff Hudson Riverkeeper Fund.

Nixon, Hargrave, Devans & Doyle, Rochester, NY (Michael R. Wolford, Robert B. Calihan, and Ronald G. Hull, of counsel), for defendant County of Orange.

## OPINION

GOETTEL, District Judge.

The cause of environmental protection has justly garnered national attention in recent years, increasing the sensitivity and concern of citizens while focusing attention on ways to combat the environmental damage caused by modern society such as through recycling programs. While searching for ways to protect the natural world while nevertheless allowing society to enjoy the material fruits of its labor, we face a struggle between two inescapable and hopelessly intertwined problems: we continue to produce massive amounts of garbage which must be put somewhere and yet most of us, fearing the environmental fallout of its disposal, cling to the idea of "not in my back yard." Not surprisingly, the ongoing tug-of-war between local governments seeking to rid themselves of their garbage and citizens worried about the environmental dangers it poses often spills into the courts. Such is the situation in the present case.

## I. FACTUAL BACKGROUND

This case involves the operation of a sanitary landfill. In 1971, Orange County (the "County") acquired some three hundred acres of land from the State of New York. The original landfill, now closed and capped, operated on only a 75–acre portion of the property. In 1987, defendant Orange County applied for a permit to construct a 154–acre expansion to the existing landfill. Administrative hearings were held in which plaintiff Orange Environment, Inc. ("OEI") participated. The Administrative Law Judge recommended against approving the permit on grounds that the landfill was a possible danger to the Southern Walkill Valley aquifer and inadequate consideration had been given to alternative sites. That recommendation was adopted by the Commissioner of the

Department of Environmental Conservation ("DEC").

After the County submitted a revised application a permit was eventually issued by DEC in December 1988 for a smaller 75–acre landfill expansion that would operate in four phases. Construction on Phase I, designed to receive over 700,000 cubic yards of fill, was completed in October 1990. Eighty percent of Phase II was completed when work ceased in February 1992. The cost of constructing the landfill expansion totaled was financed by the issuance of General Obligation Bonds. The County states that it will owe approximately $42.5 million in principal and interest on those bonds. The County further claims that it continues to lose $1 million per month in "tipping fees"—payments for private use— while the landfill expansion sits idle.

The is some dispute regarding when the issue of federally protected wetlands first arose. OEI notified the Environmental Protection Agency ("EPA") of the destruction of federally protected wetlands some two years after construction had begun on the landfill expansion. Defendants point to evidence suggesting that OEI had information concerning wetlands on the expansion site long before this. The County also maintains that DEC officials were aware of wetlands on the site based upon site visits but had concluded that none were state-protected wetlands.

Plaintiffs, however, also claim that the County knew of the existence of federally protected wetlands before construction began on the 75–acre expansion in 1988 but failed to disclose this information to DEC or the EPA. In particular, plaintiffs contend that County officials were informed in a December 1988 report by Wehran Engineering, the designers of the landfill expansion, that wetlands had already been disturbed without a permit or notification to the United States Army Corps of Engineers (the "Corps"), and before construction could proceed, the Clean Water Act ("CWA") required the County to notify the Corps.

In December 1991, before the landfill expansion opened, and after the County and the EPA were given plaintiffs' pre-suit notice of intent to sue pursuant to 33 U.S.C. § 1365(b) of the Clean Water Act, plaintiffs OEI, a not-for-profit New York corporation, and Arthur and Sandra Soons brought suit against the County and various County officials. They claimed that certain unpermitted discharges of pollutants had occurred violating § 301 of the Clean Water Act, 33 U.S.C. § 1311. In particular, plaintiffs claimed that almost fifty acres of wetlands had been filled without a permit. The County concedes that the placement of fill into the landfill expansion and the subsequent removal of wetlands violated the CWA since at least one acre of wetlands was filled at the landfill. Def. Memorandum at 12. Plaintiffs seek restoration of the lost wetlands and penalties for defendants' unpermitted discharges.

In January 1992, the County announced a suspension of its construction activities. The County hired a consultant to investigate the landfill site and render an opinion. The consultant's opinion was that restoration of the lost wetlands would require huge amounts of soil from another wetland site and its success would be speculative at best.

In February, the EPA notified the County that it was investigating possible unpermitted wetlands filling at the landfill expansion. Shortly thereafter, the County and the EPA began negotiating a Compliance Order. Discussions were held in New York regarding the forthcoming order at which the EPA was represented by Mr. Del Vicario. The EPA issued a Compliance Order in July 1992. Among other things, the Order required the County to restore lost wetlands off site and allowed the County to recommence a phased operational use of the landfill expansion subject to satisfactory completion of the off-site wetlands restoration.

Following the issuance of the Compliance Order, plaintiff filed a motion for a preliminary injunction in this court. The Hudson Riverkeeper Fund, Inc., simultaneously moved to intervene. The intervention was granted and decision on the preliminary

injunction motion was reserved pending an evidentiary hearing at which time the preliminary injunction motion was to be consolidated with a decision on a permanent injunction.

In the interim, at least three things of note have occurred. First, in August 1992, the DEC issued a permit to operate three of the seven subcells of Phase I. The DEC, however, attached a large number of conditions to its permit that the County must meet before operations can commence including repair of Phase I's leaking liner system and completion of Phase II's construction. The County hesitates to begin satisfying the DEC's conditions, which would entail significant expenses, before resolution of this action.

Second, pursuant to an agreement with defendants and the court, plaintiffs and defendants each submitted the present motions for summary judgment. Plaintiffs seek a declaratory judgment that the defendant County's unpermitted use of the landfill represents a continuing violation of the CWA since no permit has been secured from the Corps before recommencing landfill operations. All parties seem to agree that the permit issue could be decisive and no material issues of fact impact it.

Third, while a decision on the newest summary judgment motion was pending, the EPA notified Orange County on December 17, 1992 that it had begun investigating an apparent violation of the Clean Water Act consisting of unauthorized, unpermitted filling of wetlands located between the old landfill site and Phases I and II of the landfill expansion for the apparent purpose of constructing an access road. In its letter to Mary McPhillips, the County Executive, the EPA requested information regarding these most recent activities.

Defendants concede that they neither sought nor received a CWA § 404 permit before constructing the landfill expansion. Instead, they argue as a matter of law that the EPA's Compliance Order authorizes use of the landfill expansion in exchange for substantial off-site remediation. While the parties dispute the acreage of wetlands on the site, this issue is immaterial at present since all agree that at least one acre of federally-protected wetlands was destroyed, one acre being the federal jurisdictional minimum under the CWA.

## II. DISCUSSION

The Clean Water Act prohibits the discharge of fill materials into the "waters of the United States" unless authorized by a Corps permit issued pursuant to 33 U.S.C. § 1344. "Wetlands adjacent to navigable waters" and their tributaries are included within the definition of "waters of the United States." 33 C.F.R. § 328.3(a)(3); 40 C.F.R. § 230.3(s); *see also United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 135, 106 S.Ct. 455, 463, 88 L.Ed.2d 419 (1985) (§ 404 jurisdiction extends to adjacent wetlands as an integral part of the aquatic environment). Plaintiffs contend that without a § 404 permit, defendants cannot lawfully deposit more fill into the landfill expansion. They seek to enjoin defendants from using the landfill expansion until and unless the County obtains a § 404 permit from the Corps. Plaintiff maintain that defendants must either apply for an after-the-fact dredge and fill permit or restore the damaged wetlands on the site. As stated earlier, defendants' primary response is that the Compliance Order entered into with the EPA empowers the County to proceed with landfill operations without the need for a § 404 permit.

■ Plaintiffs claim entitlement to summary judgment because of defendants' liability for violation of the CWA by illegally filling in wetlands without a § 404 permit. To establish the County's liability, plaintiffs must show that: (1) the area involved contained wetlands; (2) the wetlands were filled in by the County; and (3) the County had no "fill permit." *Stoeco Dev. v. Dept. of Army Corps of Eng'rs*, 792 F.Supp. 339, 344 (D.N.J.1992).

■ The present summary judgment motions focus on the third element. The key question is whether the County is required to secure a § 404 permit from the Corps to operate the landfill expansion after receiving the Compliance Order from the EPA.

It is the defendants' position that the Compliance Order is sufficient authority for their resumption of activities at the landfill expansion and no after-the-fact permit from the Corps is required. Plaintiffs strenuously dispute this.

The Clean Water Acts's objective is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. Under the CWA, the discharge of dredge or fill materials into waters of the United States is prohibited unless authorized by a permit issued by the Corps of Engineers pursuant to § 404 of the CWA. 33 U.S.C. § 1311(a); *see also Southern Pines Associates v. United States,* 912 F.2d 713, 715 (4th Cir.1990).

■ In administering and enforcing the Clean Water Act, the EPA and the Army Corps of Engineers share responsibility. *See National Wildlife Federation v. Hanson,* 859 F.2d 313, 315 (4th Cir.1988). The Corps has the non-discretionary duty to regulate the discharge of dredged or fill materials into United States waters by issuing permits after applying guidelines established by the EPA. *See* 33 U.S.C. §§ 1344(a) and (b). The Corps also has authority to enforce permit violations. 33 U.S.C. § 1344(s).

The EPA, holding ultimate responsibility for wetlands protection, has authority to seek penalties for unpermitted discharges of pollutants into United States waters. In enforcing the CWA, Congress provided the EPA with a choice of procedures. It can issue compliance orders under 33 U.S.C. § 1319(a), commence a civil action for an injunction and penalties under 33 U.S.C. § 1319(b), or assess administrative penalties under 33 U.S.C. § 1319(g). The EPA, after consultations with the Corps, can also block or overrule the Corps' decision to issue a permit when it concludes that the discharged materials "will have an unacceptable adverse effect on municipal water supplies, shellfish beds ... wildlife, or recreational areas." 33 U.S.C. § 1344(c).

In this case, a Compliance Order was issued by the EPA pursuant to its authority under 33 U.S.C. § 1319(a). In general, a compliance order is a document served on a violator detailing the nature of the violation and specifying a time for compliance with the CWA. *See Southern Pines,* 912 F.2d at 715 (citing 33 U.S.C. § 1319(a)(5)(A)). The narrow legal issue before this court is whether terms of the Compliance Order entered into under § 1319 excuses the County from seeking a § 404 permit. As we shall discuss fully below, we hold that it does not.

As a general rule, the CWA prohibits discharging dredged or fill material into "navigable waters" including wetlands adjacent to the waters without a permit. *See Tull v. United States,* 481 U.S. 412, 414, 107 S.Ct. 1831, 1833, 95 L.Ed.2d 365 (1987); *United States v. Cumberland Farms of Conn., Inc.,* 826 F.2d 1151, 1153 (1st Cir. 1987), *cert. denied,* 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 981 (1988). Discharging pollutants without first obtaining a permit is a violation of § 301 of the CWA, 33 U.S.C. § 1311(a). *See Hudson River Fishermen's Ass'n v. County of Westchester,* 686 F.Supp. 1044, 1050 (S.D.N.Y.1988) (citing *EPA v. California ex rel. State Water Resources Control Bd.,* 426 U.S. 200, 205 & n. 14, 96 S.Ct. 2022, 2025 & n. 14, 48 L.Ed.2d 578 (1976)); *see also United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 132–33, 106 S.Ct. 455, 462, 88 L.Ed.2d 419 (1985) (holding that the Corps § 404 jurisdiction extends to wetlands adjacent to waters of the United States). The present question is whether this requirement is, in all cases, absolute or whether a compliance order issued by the EPA can impact the duty of a person to secure a permit.[1]

Essentially, defendants argue that pursuant to 33 U.S.C. § 1319, the EPA had the discretion to forego compelling removal of the landfill or the obtaining of a § 404 permit and instead order off-site remediation. The Compliance Order does state that in lieu of on-site remediation of the landfill, Orange County will create off-site wetlands.

---

1. For purposes of this motion, the parties apparently are assuming that wetlands were or will be filled and that unpermitted fill has been and will again be discharged.

This statement, however, only says that off-site remediation is ordered in lieu of on-site remediation. The plaintiffs may challenge this enforcement decision reached by the EPA as improper. The propriety of the Compliance Order's off-site remediation as a remedy for the CWA violations at the landfill raises distinct issues which we do not address at this juncture without the benefit of an evidentiary hearing.

However, we do find that the Order does not specifically say that the County need not obtain a § 404 permit. Indeed, the Compliance Order states that, "EPA retains the right to reject any [off-site remediation plan] if not in compliance with § 404 of the Act." This clearly suggests that the Compliance Order has not mooted the permitting process entirely. Instead, this provision envisions the County securing a § 404 permit for the off-site wetlands restoration project it must complete pursuant to the Compliance Order as a pre-condition to opening up the Orange County landfill expansion. It makes little sense to interpret the Compliance Order, as defendants urge, to expressly require the off-site remediation to comply with § 404 while implicitly erasing § 404's application to fill deposited into the expansion areas.

Defendants cite a number of cases in which courts have approved the use of off-site mitigation for § 404 violations. *See, e.g., United States v. M.C.C. of Florida, Inc.,* 772 F.2d 1501 (11th Cir.1985); *United States v. Bd. of Trustees,* 531 F.Supp. 267 (S.D.Fla.1981). However, the present case differs in significant respects. In *Bd. of Trustees,* a community college's Board of Trustees, in carrying out plans to construct a barrier against erosion, had filled in a pocket of shallow water along the edge of the campus, an act not authorized by either the state or federal permits they had previously secured. 531 F.Supp. at 269–70. The government brought an enforcement action against the Board. Instead of requiring the restoration of the original shallow water pocket, a plan of questionable environmental benefit, the court ordered off-site mitigation project to rehabilitate another marsh area. *Id.* at 275.

The court in *Bd. of Trustees* was not faced with the existence an EPA Compliance Order that expressly authorized a renewal of dumping activities into wetlands. The shallow water pocket was already filled in; no additional filling was envisioned. Nor did the court have to reach the issue of whether a permit was required for the fill that remained on the wetlands. In fact, the Board would likely be automatically entitled to a Nationwide Permit 32 for Completed Enforcement Actions, a permit not applicable to the non-judicial compliance orders involved in the present case. *See* 56 Fed.Reg. 59,128 (Nov. 22, 1991). Also, the present situation does not simply involve unpermitted fill already sitting in a landfill. The County stands ready to dump new fill into the landfill pursuant to the EPA's Compliance Order. The question of on-site verses off-site remediation does not seem to speak to the issue of whether the County will need a § 404 permit to commence new operations at the landfill expansion.

Defendants have argued that because the wetlands concerned are all but destroyed already, no further damages to any wetlands or navigable waters will occur. However, this line of reasoning only leads the court into questions of facts that are obviously disputed. Suffice it to say that the present case is markedly different than *Bd. of Trustees.*

In *M.C.C. of Florida,* 772 F.2d 1501, M.C.C. built a replacement bridge in the Florida Keys. While transporting the concrete segments used to construct the bridge, the propellers of the company's barges dredged vegetation and sediment from a channel causing significant damage to adjacent sea grass beds. *Id.* at 1503–04. After the government brought an enforcement action, the district court held that the dredging and redepositing of bottom sediment on nearby sea grass beds represented violations of the Clean Water Act. *Id.* at 1504. The Court of Appeals affirmed the district court's decision to reject the plans for on-site restoration of the sea grass beds because the prospects for success were too speculative and the plans too costly. Instead, the court ordered defendants to pro-

vide an alternative beneficial environmental area, one that was comparable to the destroyed area and served the same environmental purpose. *Id.* at 1507.

While *M.C.C. of Florida* does illustrate how courts have some discretion in assessing the viability and wisdom of on-site verses off-site remediation plans for violations of the Clean Water Act, the case did not concern issues surrounding an EPA compliance order and its effect on the need to secure a § 404 permit for the discharge of pollutants into the environment. For similar reasons, we find the balance of cases cited by defendants on this point unpersuasive.

Defendants maintain that plaintiffs' efforts to impose their own "personalized" remedy on the County run counter to the idea that the EPA, as the public's representative, is in the best position to vindicate society's rights and interests. *See Hudson River Fishermen's Ass'n,* 686 F.Supp. at 1052. Thus, the argument goes, the court should defer to the EPA's balancing of the goals of the CWA with the public's interests and needs represented by the Compliance Order. However, *M.C.C. of Florida* is not a case signalling a court's deference to the EPA's expertise in assessing the best course of action when remedying CWA violations. Indeed, the court expressly rejected the two alternative restoration plans submitted by the EPA, instead fashioning its own mitigation plan.

■ The case of *Arkansas Wildlife Fed. v. Bekaert Corp.,* 791 F.Supp. 769 (W.D.Ark.1992), seems more instructive for the present action. In *Arkansas Wildlife Fed.,* the district court had to determine the preclusive effect of a series of compliance orders issued by the EPA concerning a facility's discharges of wastewater into the Arkansas River in violation of the effluent limitations of its National Pollutant Discharge Elimination System ("NPDES") permit. The defendant company argued

that plaintiff's citizen suit, premised on past and continuing NPDES permit violations, was barred where the EPA had already initiated an administrative compliance order pursuant to 33 U.S.C. § 1319(a). As the district court recognized, citizens are precluded only where the EPA is diligently prosecuting an action for administrative penalties pursuant to § 1319(g), not simply where the EPA has entered compliance orders under § 1319(a). *Id.* at 775.

Here, defendants argue that a citizen suit cannot supplant the EPA's enforcement of the CWA. As should be apparent from our discussion of *Arkansas Wildlife Fed.,* defendants are only partially correct. There is no general preemption of citizen suits by all EPA enforcement activities. As the court in *Arkansas Wildlife Fed.* noted, "Congress has not provided that citizen suits are barred whenever an administrative action is underway or simply because there may be some duplication with a government proceeding." *Id.*

Under 33 U.S.C. § 1365(b)(1)(B), citizen suits are only preempted when the EPA has commenced and is diligently prosecuting a civil or criminal action in a federal court.[2] Because they do not qualify as a federal court proceeding, compliance orders issued by the EPA pursuant to § 1319(a) do not by definition preempt an ongoing citizen suit. *See Student Public Interest Research Group v. Fritzsche, Dodge & Olcott,* 759 F.2d 1131, 1139 (3rd Cir.1985) (a court-enforceable consent order entered into by the EPA and a CWA violator does not preempt a citizen suit). Further, if the CWA violations are continuing or if the terms of a settlement raise a realistic prospect that continuing violations exist, plaintiffs' citizen suit can continue. *See Atlantic States Legal Foundation, Inc. v. Eastman Kodak Co.,* 933 F.2d 124, 128 (2d Cir.1991).

**2.** In particular, 33 U.S.C. § 1365(b)(1)(B) precludes a citizen suit "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order...."

Section 1319(g)(6)(B)(ii) also provides an additional preclusion provision, not at issue here, where the EPA has commenced and is diligently prosecuting an action to assess administrative penalties.

Defendants primary argument is that the compliance order issued by EPA acts as the functional equivalent or substitute for a § 404 permit from the Army Corps of Engineers. As defendants succinctly put it, "The authorized placement of solid waste in the expansion landfill does not implicate section 404 because such activities are expressly authorized by the Compliance Order." Def.Memorandum at 12. There is no doubt that the Compliance Order authorizes the County to reopen to landfill expansion once the County satisfies the conditions incorporated in it. However, as we noted, the vital question is whether this obviates the need for a § 404 permit.

The court's own independent research has revealed no reported cases expressly addressing this issue. Hence, it is not surprising that all parties are generally able to distinguish the cases offered to support their opponent's arguments leaving none dispositive. Each side uses their opponent's inability to cite any authority squarely on-point to demonstrate the weakness of their legal position. Rather than confirming or undermining any one side's position, the paucity of cases indicates that no court to anyone's knowledge has definitively reached the issue of whether a compliance order issued by the EPA pursuant to 33 U.S.C. § 1319(a) replaces the need to secure of § 404 permit from the Corps.

Only one case touches upon this issue, and only in the most cursory manner. The district court in *Kitlutsisti v. Arco Alaska, Inc.*, 592 F.Supp. 832 (D.Alaska 1984), *dismissed as moot*, 782 F.2d 800 (1986), without discussion rejected the notion that a § 1319 compliance order by the EPA was the functional equivalent of a § 404 permit. *Id.* at 839.

Plaintiffs also argue that the court in *Hudson River Fishermen's Ass'n v. Westchester Cty.*, 686 F.Supp. 1044, rejected the argument that a federal enforcement action insulated a defendant from obtaining a CWA discharge permit. In that case, however, the court permitted the citizens' suit to continue because the remedies sought by the federal government in its enforcement action were based on an earlier consent decree which did not address two potential sources of pollution emanating from the disputed landfill. Because certain remedies sought in the citizens' suit might have been beyond the scope of the original consent judgment, the governmental action might not have addressed the factual grievances asserted by the citizens' suit. *Id.* at 1052–53. This scenario is factually somewhat different than the present action.

Since we find no clear authority among the reported cases, we ground our decision on the explicit language of the Compliance Order issued to the County. Without question, as defendants maintain, the Order conditions restored operations at the landfill expansion site on satisfactory remediation of off-site wetlands. It is also true, as defendants argue, that the Order nowhere explicitly states that future landfill operations require a § 404 permit. Neither does it expressly say that no § 404 permit is required before operations may commence. However, the EPA's Order specifically states:

> This ORDER in no way limits the authority of the Secretary of the Army, acting through the Chief of Engineers, to issue, to deny, or to specify any conditions in any permit, or to otherwise carry out his functions relating to the issuance of permits for the discharge of dredged or fill material under section 404 of the Act. This ORDER does not constitute a waiver from compliance or modification of the Act.

Plaintiff's Exhibit 3 at 13–14. Giving the language its plain meaning, the Order expressly indicates that it shall not be used as a substitute for compliance with the CWA's requirements. Nothing in the Order indicates that the § 404 permitting process, required for any discharges of fill, is somehow excluded from this directive.

As the Army Corps of Engineers also recognized, a nationwide permit:

> authorizes structures, work, and discharges of dredged of fill material *only* for completed U.S. Government enforcement actions brought by the U.S. Department of Justice and covered by a federal court decision, consent decree, or settle-

ment agreement resolving litigation in the Federal Courts. Consequently, [the nationwide permit] cannot be used to authorize illegally placed fill that would remain in place under the terms of an agreement reached by the U.S. Environmental Protection Agency pursuant to an Administrative Order (A.O.) only, where that A.O. has not led to action in the Federal Courts.

Letter dated December 23, 1992 to Robert F. Kennedy, Jr. from Paul Cheverie, District Counsel, the Department of the Army, Office of Counsel. None of the parties takes issue with the conclusion that a nationwide permit is inapplicable to the present case. In its letter, the Corps goes on to say that it is prepared to review "an after-the-fact permit application for dredged or fill material which was illegally discharged but which would remain in place pursuant to the terms of a U.S. EPA Administrative Consent Order." *Id.* The import of the Corps' position is clear. If asked to do so, it stands ready to process the County's application for an after-the-fact permit. If it viewed the EPA's Compliance Order as the functional equivalent or a complete substitute for a § 404 permit, there would be little need for any further permits from the Corps for the landfill. Indeed, in its December 23, 1992 letter, the Corps' District Counsel states that:

> It is my understanding that certain parties have inferred that the Corps has taken the position in earlier communications concerning the Orange County Landfill that no individual after-the-fact permit was required and/or that the Corps would not be willing to process such a permit application. Let me assure you that the Corps has not taken either position; such an inference would clearly be inconsistent with the regulations and law referred to above.

*Id.* The Corps thus specifically denies that no after-the-fact permit is required. The Corps, when reviewing the County's application for an after-the-fact permit, may take into account the EPA's position that off-site remediation is the best solution to the illegally discharged fill now sitting atop the wetlands at the landfill expansion site.

However, this is not to say that the Compliance Order itself can replace a § 404 permit.

■ As other courts have held, "the CWA's requirement that all discharges covered by the statute must have a NPDES permit 'is unconditional and absolute. Any discharge except pursuant to a permit is illegal.'" *United States v. Tom–Kat Development, Inc.,* 614 F.Supp. 613, 614 (D.Alaska 1985) (quoting *Kitlutsisti v. Arco Alaska, Inc.,* 592 F.Supp. 832, 839 (D.Alaska 1984)); *see also Weinberger v. Romero–Barcelo,* 456 U.S. 305, 319, 102 S.Ct. 1798, 1806, 72 L.Ed.2d 91 (1982). Nothing in the language of the EPA's Compliance Order justifies interfering with this principle. Following this course, we conclude that operation of the landfill expansion without a § 404 permit would violate the CWA.

Our holding insures that polluters do not sidestep the process of review defined by the CWA for securing a § 404 permit. The Corps can issue a § 404 permit only "after notice and opportunity for public hearings" on permit applications have been provided. 33 U.S.C. § 1344(a). Courts have held that to comply with the CWA, the Corps "must give public notice, conduct hearings, make its own assessment of the impacts of the proposed project, and create a reasoned administrative record for its decision." *Sierra Club v. U.S. Army Corps of Engineers,* 701 F.2d 1011, 1031 (2d Cir.1983).

Moreover, the CWA expressly gives the public the right to request copies of all permit applications and permits for their inspections and reproduction. 33 U.S.C. § 1344(*o*). This provision no doubt enables the public to inform itself of actions that may potentially impact their environment and allows the public to participate in permit hearings in an informed manner. Nothing in the statute evidences an intent by Congress to allow the EPA to use its powers to issue compliance orders under § 1319 as a substitute for a § 404 permit.

Here, the compliance order between the EPA and the County was the result of meetings and months of negotiations be-

tween the EPA and County officials. The public was afforded no opportunity to express its views or to rebut or counter any evidence or arguments raised by the County in support of its planned operations of the landfill expansion. Indeed, nothing suggests that the general public was even informed that meetings were being held to resolve the County's CWA violations at the landfill.

Aside from the fact that the § 404 permitting power is entrusted to the Corps by the CWA and not the EPA, the process which led to the EPA's issuance of the compliance order to the County evidences none of the procedural components required for § 404 permitting. As such, the procedures used by the EPA to finalize the compliance order are a poor substitute for the CWA requirements which guarantee the public a meaningful role in the § 404 permitting process.

In a letter submitted subsequent to oral argument on this motion, defendants argue that the absence of a public hearing was one of the CWA violations remedied by the EPA's Compliance Order. In particular, defendants stress that "the fact that the EPA and the Corps elected to remedy the County's violation through procedures that did not require a hearing does not mean that agency action should now be judicially set aside." Letter dated December 21, 1992 from Michael R. Wolford at 3.

■ Defendant misapprehends our point. We are not invalidating or setting aside the EPA's Compliance Order. As we stated earlier, we do not decide at this juncture whether the off-site remediation ordered by the EPA to remedy the County's past wetlands filling was consistent with the CWA's mandates. Rather, following the express language of the Order, we conclude that the § 404 permitting process is not simply a "remedy" that the EPA can "elect" to forego. Neither, for that matter, are the public hearings which are incorporated into that process. It would be anathema to find that the Compliance Order was the functional equivalent of a § 404 permit for the discharge of fill onto federal wetlands when the permitting process requires pub-

lic hearings while the process leading to the Compliance Order included none.

Denying citizens any opportunity to register their opinions, submit evidence, or challenge the environmental conclusions reached by the government or permit applicants would enable potentially harmful activities to proceed with governmental approval without ever having been tested in the crucible of public scrutiny. This would undermine one of the foundations of the Clean Water Act, the public's role in safeguarding the integrity and security of our nation's waters and wetlands. Under these circumstances, to allow the County to use the Compliance Order as the functional equivalent of a § 404 permit would emasculate the very idea of public participation in the permitting process that the CWA mandates.

■ Defendants also strenuously argue that after-the-fact permits are merely one of the enforcement options available to the EPA and Corps, as opposed to prospective § 404 permits which are required by the CWA. As a discretionary enforcement device, they contend that the court should not compel the County to seek an after-the-fact permit when the EPA has already elected off-site remediation as the best remedy for the County's past violations at the landfill site. However, the CWA makes no distinctions between after-the-fact or "prospective" permits; all permits, including after-the-fact permits, are processed pursuant to § 404. *See* 33 C.F.R. § 326.3(e)(1) (1992); *United States v. Cumberland Farms, Inc.,* 644 F.Supp. 319, 320 (D.Mass.1986), *aff'd,* 826 F.2d 1151 (1st Cir.1987), *cert. denied,* 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 981 (1988).

Moreover, 33 C.F.R. § 326.3(e) requires the Corps to accept and process an after-the-fact permit application submitted by an unpermitted discharger. The Corps' December 23, 1992 letter confirms this fact by stating that an unwillingness to process an after-the-fact permit application would contradict federal regulations and law.

In addition, even if after-the-fact permits are not necessary in all cases where an illegal project has been completed, as de-

fendants contend, the Orange County landfill expansion is not a completed project. Indeed, in many ways it is a project just beginning with further construction and operations yet to commence. And when we consider that phased operational use of the landfill expansion have yet to commence, it becomes questionable whether "after-the-fact" is even an appropriate way to characterize it.

Defendants contend that our holding will eradicate the usefulness and purpose of Compliance Orders, removing all incentive for CWA violators to enter into them with the EPA. We do not share their dire predictions. Polluters caught violating the CWA still have reason to enter into compliance orders with the EPA in order to settle cases of wholly past violations where the polluter does not intend to make future discharges. Naturally, people such as the plaintiffs here might seek to challenge the adequacy of the EPA's chosen remedies but this does not erase the usefulness for the EPA and CWA violators of addressing past violations through compliance orders.

Contrary to defendants' position, the Compliance Order has not been transformed into simply an EPA recommendation by our decision. The ordering of off-site remediation may still represent the EPA's discretionary enforcement choice regarding the fill that already sits atop wetlands. We reach no decision on the propriety of the EPA's remediation decision as opposed to restoration of the filled wetlands. We do not hold that restoration is automatic nor do we say that the unpermitted fill should remain in place. We express no opinion as to whether an "after-the-fact" permit for the filled wetlands should have been ordered by the EPA. Hence, our decision should cause no real interference with the Memorandum of Agreement between the EPA and the Corps concerning enforcement of the CWA's section 404 program. As discussed more fully below, our holding in this case simply means that the compliance order cannot authorize *future* unpermitted discharges of fill which might otherwise run afoul of § 404.

■ Lastly, we dispose of the argument raised by defendants that the Compliance Order addresses any violations of the CWA at the landfill site, effectively rendering them wholly past violations. As a result, defendants contend, plaintiffs cannot maintain their suit against the County and the County need not secure a § 404 permit.

The Supreme Court has held that citizen suits pursuing remedies for wholly past violations may not be maintained. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) (§ 1365(a) does not confer federal jurisdiction over citizens suits for wholly past violations). Plaintiffs who file a citizens suit under § 1365(a) must allege "either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Id.* at 57, 108 S.Ct. at 380.

However, the Compliance Order issued to the County does not sweep so broadly as to transform all activities at the landfill expansion into past violations. The County concededly violated the CWA by filling in federal wetlands without a § 404 permit. In its Compliance Order, the EPA conditioned the opening of the landfill expansion on certain off-site remediation. To the extent ordering the restoration of wetlands off-site represents the EPA's enforcement for past violations—*i.e.,* the dumping that has already occurred—the plaintiffs' citizen suit may arguably be supplanted. However, this does not mean that the renewed operations at the landfill expansion without a § 404 permit also represent past violations. As an aside, plaintiffs strenuously argue that wetland soils still exist under the Phase I and II sites.

In any event, we reject the notion that these future discharges can be viewed as part and parcel of the past filling that has already occurred at the site. Indeed, our holding that the County must acquire a § 404 permit from the Army Corp of Engineers rests on our conclusion that renewed operations at the expansion site will represent a continuing violation of the CWA despite the existence of the Compliance Or-

der. We disagree that the issues here are solely ones of enforcement, not permitting.

Our conclusion is further bolstered by the most recent events at the landfill. As we noted earlier, the EPA notified the County in December 1992 of its investigation into the County's construction of an access road through the expansion site, construction which may have involved the unpermitted filling of wetlands located between the old landfill site and Phases I and II of the expansion. Defendants argue that an access road to the original landfill, now closed, has no relevance to the present case. Perhaps, but the fact that wetland soils survive in and around the individual dump sites at the Orange County landfill casts some doubt on the defendants' statements that "there are no surviving wetlands which would be impacted by the placement of solid waste discharges into the landfill" and "future use of the landfill expansion will not involve filling of wetlands." Def.Memorandum at 12 and 17. Building and using access roads into and around the landfill are part of the operation of a landfill. For all the foregoing reasons, it would be impossible for us to conclude that the County's landfill activities only involve past violations of the CWA.

## III. CONCLUSION

In sum, we hold that the compliance order issued by the EPA to the County purporting to settle the County's violations of the CWA at its Orange County landfill does not remove the County's duty to obtain a § 404 permit from the Army Corps of Engineers before commencing operations at the landfill expansion site. We therefore grant plaintiffs' motion for summary judgment while concurrently denying defendants' motion for summary judgment.

SO ORDERED.